Jim FRADY, Administrator of the Estate of Beverly J. Frady, Deceased, Plaintiff-Appellant,

v.

Robert A. HEDGCOCK, M.D., Defendant-Appellee.

No. 12A02–8602–CV–67.

Court of Appeals of Indiana, First District.[1]

Sept. 25, 1986.

Rehearing Denied Oct. 30, 1986.

Kevin P. Farrell, Townsend Yosha Cline & Price, Indianapolis, for plaintiff-appellant.

Larry R. Fisher, Thomas J. Herr, Stuart & Branigin, Lafayette, for defendant-appellee.

RATLIFF, Judge.

## STATEMENT OF THE CASE

Jim Frady appeals an adverse summary judgment in favor of Dr. Hedgcock. We reverse.

## FACTS

The facts most favorable to the judgment indicate that Beverly J. Frady was the patient of Dr. Hedgcock for several years up until her death. She consulted and received treatment from him on a regular basis from 1976 until June of 1980. Her death apparently was caused by renal failure.

In February of 1980, Dr. Hedgcock hospitalized Beverly for an upper respiratory infection accompanied by nausea, vomiting and anemia. A blood test revealed abnormal readings in inorganic phosphate, uric acid, and blood urea nitrogen (BUN). Her

---

1. This case was diverted from the Second District by order of the Chief Judge.

BUN was 55. A normal BUN, according to Dr. Hedgcock, was 26. The high BUN was indicative of renal failure. Beverly was discharged from the hospital on March 5, 1980, despite Dr. Hedgcock's admonitions to the contrary.

On April 21, 1980, Dr. Hedgcock saw Beverly again. Her blood pressure was quite high—230/130. However, the doctor did not find this significant and conducted no additional tests to determine if her BUN was still high.

On May 29, 1980 and June 5, 1980, Dr. Hedgcock unsuccessfully attempted to persuade Beverly to see Dr. Bond, a dermatologist, after she had been experiencing itching for two months. On June 17, 1980, Dr. Hedgcock saw Beverly for the last time. At that time, the doctor prescribed medication for the itching.

On July 3, 1980, Beverly went to Dr. Bond about the continued itching. Dr. Bond obtained a complete blood count. Beverly's BUN was now 128 with a creatinne of 13.2 which was indicative of renal failure. Dr. Bond concluded that her itching was a result of the elevated BUN. Beverly was referred to Dr. Ash, a nephrologist, on the same day. Dr. Ash hospitalized her immediately. Beverly died on July 22, 1980 while in the hospital. One of Dr. Ash's assessments in his discharge summary was that Beverly suffered renal failure prompted by long-term drug abuse. During his four years of treatment, Dr. Hedgcock had prescribed over thirty medications. The record is not clear how many, if any, of these drugs were being taken after June 17, 1980, Beverly's last visit to Dr. Hedgcock.

On July 21, 1982, Jim Frady, Beverly's husband, filed a proposed complaint with the Department of Insurance pursuant to the Indiana Medical Malpractice Act (Indiana Code section 16–9.5–9–1). Upon review by the medical review panel which was convened pursuant to Indiana Code section 16–9.5–3–1, a unanimous decision found that "the evidence supports the conclusion that defendant failed to comply with the appropriate standard of care as charged in the complaint, and the conduct complained of was a factor in the resultant death of the decedent." Mr. Frady then filed a complaint with the trial court on February 23, 1984. On November 20, 1985, the trial court granted the defendant's motion for summary judgment.

## ISSUES

1. Did the trial court err by applying the Medical Malpractice Act's statute of limitations to a wrongful death action arising out of alleged medical malpractice?

2. Did the trial court err in concluding no genuine issue of fact existed as to whether Mr. Frady failed to timely file his complaint?

## DISCUSSION AND DECISION

*Issue One*

The statute of limitations for the Medical Malpractice Act, Indiana Code section 16–9.5–3–1, provides that any claim against a health care provider must be brought "within two [2] years from the date of the alleged act, omission or neglect." In contrast, Indiana Code section 34–1–1–2 provides that any action for wrongful death must be brought "by the personal representative of the decedent within two (2) years." We thus confront the issue of which statute of limitations to apply.

In *Warrick Hospital, Inc. v. Wallace* (1982), Ind.App., 435 N.E.2d 263, *trans. denied*, this court held that a plaintiff in a wrongful death action based upon alleged medical malpractice must satisfy the conditions precedent of the wrongful death statute, one of which is the appointment of a personal representative within two (2) years of the death. However, *Warrick* was overruled this year by our supreme court in *Community Hospital v. McKnight* (1986), Ind., 493 N.E.2d 775. In that case, the court held that a person pursuing a wrongful death claim need not be appointed the personal representative of the decedent when the claim is based upon alleged medical malpractice. The court's rationale was centered on the clear lan-

guage of the Medical Malpractice Act pertaining to who may file such an action. This result is harmonious with our conclusion that, "Viewed from the historical perspective we believe the conclusion is inescapable that our General Assembly intended that all actions the underlying basis of which is alleged medical malpractice are subject to the [medical malpractice] act." *Sue Yee Lee v. Lafayette Home Hospital, Inc.* (1980), Ind.App., 410 N.E.2d 1319, 1324, *trans. denied.*

■ We see no reason why *Community Hospital* is not applicable to the case under consideration. We hold that the statute of limitations for the Medical Malpractice Act is applicable instead of the time period imposed for wrongful death actions. Therefore, an action for wrongful death based upon medical malpractice must be filed within two years of "the date of the alleged act, omission or neglect," not within two years of the date of the death.

*Issue Two*

Indiana Rules of Procedure, Trial Rule 56(C) states the test for a trial court's order for summary judgment. We recently explained our standard of review for such action in *Penwell v. Western and Southern Life Insurance Co.* (1985), Ind.App., 474 N.E.2d 1042, 1044:

"When reviewing the grant of a motion for summary judgment we stand in the shoes of the trial court. We must determine whether any genuine issue of material fact exists and whether the law was correctly applied.... We must liberally construe all evidence in favor of the non-movant and resolve any doubt as to the existence of a genuine issue against the proponent of the motion. ... A fact is material if it facilitates resolution of any of the issues involved." (Citations omitted).

The Indiana Medical Malpractice Act's two (2) year statute of limitations generally commences at the occurrence of negligence as opposed to the discovery of negligence. *Spoljaric v. Pangan* (1984), Ind.App., 466 N.E.2d 37, 40, *trans. denied.* In the case

under consideration, Beverly last saw Dr. Hedgcock on June 17, 1980. She was hospitalized by Dr. Ash on July 3, 1980. Beverly died on July 22, 1980, just 34 days after her last visit to Dr. Hedgcock, the defendant. Since Beverly's husband commenced this action on July 21, 1982, any "alleged act, omission or neglect" on the part of Dr. Hedgcock must have occurred on or after July 22, 1980, for the action to have been filed timely. Thus, since Beverly died on July 22, 1980, the defendant's alleged negligence must have occurred on that date for this action to be timely filed.

The two year statute of limitations may be tolled under two theories, one of which is the continuing wrong theory. When an entire course of conduct combines to produce an injury, the conduct may constitute a continuing wrong so as to delay the running of the statute of limitations. *Montgomery v. Crum* (1928), 199 Ind. 660, 161 N.E. 251. Under this theory, the statutory period commences at the end of the continuing wrongful act. *Id.*

■ In the case at bar, Dr. Hedgcock had treated Beverly for four years and had prescribed many medications for her during that period. Between April 12, 1980 and June 17, 1980, the doctor had written six (6) prescriptions for Beverly. It is not clear from the record how many, if any, of the prescriptions were still in effect at July 22, 1980, the date of Beverly's death. Thus, a material issue of fact existed as to whether Dr. Hedgcock's treatment and prescriptions could be considered a continuing wrong as late as July 22, 1980, the last day for which the cause of action could have accrued.

■ A second theory which may toll the statute of limitations is the fraudulent concealment doctrine. Indiana Code section 34-1-2-9; *Guy v. Schuldt* (1956), 236 Ind. 101, 138 N.E.2d 891. Where normally some affirmative effort on the part of the one guilty of concealment would be necessary to toll the statute of limitations, such concealment need not be proven when there is a fiduciary or confidential relation-

ship giving rise to a duty to disclose material information. *Dotlich v. Dotlich* (1985), Ind.App., 475 N.E.2d 331, *trans. denied.* Since Dr. Hedgcock was Beverly's physician, he had a duty to disclose material information to her. *Weinstock v. Ott* (1983), Ind.App., 444 N.E.2d 1227, 1236, *trans. denied.* The record is ambiguous and raises a material issue of fact as to whether Dr. Hedgcock disclosed the high BUN and blood pressure levels and their significance to Beverly. If he did fail to disclose this information, then Beverly may have been deprived the information necessary to commence a diligent inquiry into the quality of Dr. Hedgcock's care. This in turn would justify tolling the statute of limitations.

■ Another material issue of fact exists under the fraudulent concealment doctrine as to when the physician-patient relationship ended between Dr. Hedgcock and Beverly. This is a key issue because Dr. Hedgcock's duty to disclose material information lasted only as long as the confidential relationship. *Weinstock*, at 1236. In *Adams v. Luros* (1980), Ind.App., 406 N.E.2d 1199, this court set forth the considerations when inquiring as to when the doctor-patient relationship terminates:

> "There are many factors that enter into the analysis of determining when a physician-patient relationship ends. The subjective views of the parties are important and a consideration must be given to objective factors, including, but not limited to, the frequency of the visits, whether a course of treatment was prescribed by the doctor (to be followed with or without consultation), the nature of the illness, the nature of the physician's practice and whether the patient began

consulting other physicians for the same malady."

*Id.* at 1203. Under all of these factors, it is not clear whether the doctor-patient relationship between Beverly and Dr. Hedgcock ended before July 22, 1980. As stated earlier, it is unclear as to whether Beverly was still taking medications prescribed by Dr. Hedgcock. Supporting the view that their relationship ended prior to July 22, 1980 are the facts that Dr. Hedgcock last saw Beverly on June 17, 1980 and never had an opportunity to examine her after her hospitalization on July 3, 1980. Facts which suggest a contrary conclusion include reports sent to Dr. Hedgcock by Dr. Ash and Dr. Bond after her last hospitalization, Dr. Hedgcock's research into her symptomatology after her death, and Dr. Hedgcock's meeting with Beverly's family after her demise. Thus, a material issue of fact existed as to whether the physician-patient relationship between Beverly and Dr. Hedgcock had ended prior to July 22, 1980.

When the trial court held that the two year statute of limitations was not tolled by either the continuing wrong theory or the fraudulent concealment doctrine, the court did not liberally construe the facts in favor of the nonmoving party, Mr. Frady. Therefore, summary judgment was improper.

Reversed.

ROBERTSON, P.J., and NEAL, J., concur.