Delores FERRELL, and Mark Ferrell,
Plaintiff-Appellants,

v.

Hans E. GEISLER, Defendant-Appellee.

No. 30A01–8607–CV–180.

Court of Appeals of Indiana,
First District.

March 24, 1987.

Rehearing Denied May 6, 1987.

O. Wayne Davis, Conour & Davis, Mark W. Sears, Indianapolis, for plaintiffs-appellants.

Richard L. Fairchild, Donn H. Wray, Stewart, Irwin, Gilliom, Meyer & Guthrie, Indianapolis, for defendant-appellee.

NEAL, Judge.

## STATEMENT OF THE CASE

Plaintiff-appellants, Delores Ferrell and her husband Mark Ferrell, appeal an adverse summary judgment granted by the Hancock Superior Court in their action for medical malpractice against defendant-appellee, Hans E. Geisler.

We reverse.

## STATEMENT OF THE FACTS

The undisputed facts before the court are as follows. Doctors David Everetts (Everetts) and Hans E. Geisler (Geisler) were OB/GYN specialists and were associates. Commencing in 1976 or 1977, they were physicians for Delores Ferrell (Ferrell). Thereafter, in September 1978, Geisler examined Ferrell during her pregnancy, and delivered her baby in March 1979. During the summer of 1979, Ferrell discovered lumps in her breasts, which caused her to visit Everetts on October 1, 1979, January 21, 1980, and August 11, 1980; and to visit Geisler on August 26, 1980. During these visits, various examinations were made to detect breast cancer. On January 29, 1981, Everetts ordered still further tests, which were conducted on February 4, 1981, and sent to Dr. Geisler. The results of the tests were reported as follows:

"There are an increasing number of small calcifications noted in the right breast. These are predominately deep and extend outward toward the axilla. They don't seem to be specifically related to the subareolar area or to ducts. There is fibrocystic disease bilaterally. The small calcifications are more evident on the right. Clusters of these are at times associated with small carcinomas or even infiltrating carcinoma. Unfortunately, at this time I cannot localize a mass lesion nor I believe could I localize a specific area to suggest biopsy. If there is a palpable lesion in the right breast in the superior half of the breast, I would strongly recommend consideration of biopsy."

*Record* at 68. In spite of the ominous tone of the report, Geisler did not order a biopsy, but on February 12, 1981, he told Ferrell in effect that there was no reason to be concerned. On July 31, 1981, Ferrell again visited Geisler. At that time, Geisler prescribed a cream for her right nipple irritation and told her to return in six months. He also advised her that she was healthy.

Ferrell returned to Geisler on September 21, 1981, because she detected lumps under her arm. As a result of this latter examination, a biopsy was performed on September 28, 1981, which indicated infiltrating duct cell carcinoma of the right breast and positive lymph nodes. Geisler performed a modified right radical mastectomy with complete axillary lymph dissection on Ferrell on October 2, 1981, and saw her for the last time when he removed the stitches on October 14, 1981. By the time of surgery, the breast cancer was far advanced.

Suit was brought for medical malpractice based on negligent failure to timely diagnose and treat Ferrell's breast cancer. The proposed complaint was filed with the Indiana Insurance Commissioner, pursuant to the Indiana Medical Malpractice Act, IND. CODE 16-9.5-9-1, on September 1, 1983. Subsequently, the trial court granted Geisler's motion for summary judgment based upon the expiration of the statute of limitations. The sole issue on appeal is the propriety of this ruling.

## DISCUSSION AND DECISION

Summary judgment is appropriate only when there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law. In reviewing the granting of a summary judgment by the trial court, our function is to determine first if a genuine issue of material fact exists and if none, whether the trial court properly applied the law. *Nahmias v. Trustees of Indiana University* (1983), Ind.App., 444 N.E.2d 1204, *trans. denied.* Here, the trial court found that there was no genuine issue of fact, and the parties do

not challenge that conclusion. Ferrell claims that the trial court made an erroneous application of the law. The following three cases are dispositive of the issues here: *Frady v. Hedgcock* (1986), Ind.App., 497 N.E.2d 620; *Spoljaric v. Pangan* (1984), Ind.App., 466 N.E.2d 37, *trans. denied;* and *Nahmias, supra.*

The statute of limitations involved here is IND. CODE 16–9.5–3–1. It provides that no medical malpractice claim may be brought unless "filed within two (2) years from the date of the alleged act, omission, or neglect...." This statute has been repeatedly described as an "occurrence" statute rather than a "discovery" statute, that is, the two-year statute of limitations commences at the occurrence of negligence as opposed to the discovery of negligence. *Frady, supra; Spoljaric, supra.*

Two doctrines are involved in this case which may toll the limitation period; the doctrine of fraudulent concealment and the doctrine of continuing wrong. The doctrine of fraudulent concealment operates to estop a defendant from asserting a statute of limitations when he has, either by deception or by a violation of a duty, concealed from the plaintiff material facts thereby preventing the plaintiff from discovering the malpractice. *Spoljaric, supra; Nahmias, supra.* Thus, equitable estoppel can arise either from active efforts to conceal the malpractice or from a failure to disclose material information when a fiduciary or confidential relationship exists between the physician and the patient. *Frady, supra; Spoljaric, supra.* The failure of the physician's duty to disclose that which he knows, or in the exercise of reasonable care should have known, satisfies the conduct requirement and constitutes a constructive fraud. *Spoljaric, supra.* This constructive fraud terminates with the termination of the physician-patient relationship and the statute of limitations begins to run. *Id.* Also, when a patient learns of the malpractice, or discovers information which would lead to the discovery of the malpractice, if the patient exercises reasonable diligence, the statute will commence to run. *Id.; Nahmias, supra.* Fraudulent concealment

thus tolls the running of the statute of limitations until either the end of the physician-patient relationship or the discovery by the patient of the malpractice or discovery of information which, in the exercise of reasonable diligence, would lead to discovery of the malpractice. *Frady, supra; Spoljaric, supra; Nahmias, supra.*

Under the fraudulent concealment doctrine, the plaintiff does not have, as a matter of law, two full years from the discovery to file his claim. *Spoljaric* held that where grounds exist for estopping a defendant from claiming the statute of limitations as a defense, estoppel will nevertheless be denied if the plaintiff fails to exercise due diligence in filing his claim after the equitable grounds cease to be operational as a valid basis for inducing the plaintiff's delay. A plaintiff should have a reasonable time within which to commence an action after the discovery of the malpractice. *Id.* Where the period between discovery and the date upon which the statute would ordinarily expire is relatively short, a factual question may be presented as to whether the remaining time was reasonable. *Id.*

In *Frady, supra,* the court applied the doctrine of continuing wrong to medical malpractice. In that case, the plaintiff's theory was negligence in the failure to diagnose renal failure. The defendant doctor saw the decedent for the last time on June 17, 1980. The decedent died on July 22, 1980. The court stated:

"The two year statute of limitations may be tolled under two theories, one of which is the continuing wrong theory. When an entire course of conduct combines to produce an injury, the conduct may constitute a continuing wrong so as to delay the running of the statute of limitations. *Montgomery v. Crum* (1928), 199 Ind. 660, 161 N.E. 251. Under this theory, the statutory period commences at the end of the continuing wrongful act. *Id.*

In the case at bar, Dr. Hedgcock had treated Beverly for four years and had prescribed many medications for her during that period. Between April 12, 1980

and June 17, 1980, the doctor had written six (6) prescriptions for Beverly. It is not clear from the record how many, if any, of the prescriptions were still in effect at July 22, 1980, the date of Beverly's death. Thus, a material issue of fact existed as to whether Dr. Hedgcock's treatment and prescriptions could be considered a continuing wrong as late as July 22, 1980, the last day for which the cause of action could have accrued."

*Frady, supra* at 622. Geisler's argument follows the fraudulent concealment theory. He argues that July 31, 1981, was the last date upon which the failure to diagnose breast cancer and order a biopsy could be predicated. The two-year statute of limitations would have then expired on July 30, 1983. Assuming that fraudulent concealment existed, discovery of the malpractice occurred on September 21, September 28, October 2, or at the latest, October 14, 1981, the last time Geisler treated Ferrell. Ferrell would still have approximately 22 months, a clearly reasonable time, to file her claim. She did not, and is foreclosed.

Ferrell's argument is likewise predicated upon the fraudulent concealment theory. However, she contends that she has two full years from the date of discovery, September 21, 1981, at the earliest, in which to file her claim. She attacks *Spoljaric* as being erroneous, and a departure from the holdings in prior cases. We disagree. So far as the fraudulent concealment doctrine is concerned, *Spoljaric* is controlling.

We further disagree with Geisler's analysis of the relationship between the parties. The malpractice alleged here is the failure to diagnose until the malignancy was far advanced. Though Geisler had been furnished with the report suggesting carcinoma and strongly recommending a biopsy, it is alleged that he did nothing, but merely assured Ferrell she was healthy. In his argument, Geisler assumes that since Ferrell did not come to his office between July 31 and September 21, 1981, he had no duty toward her in that interim. We disagree. The physician-patient relationship between Geisler and Ferrell had been established in 1976 or 1977, and had continued up to and including October 14, 1981. Ferrell began consulting Everetts, Geisler's associate, concerning the breast cancer on October 1, 1979, and was transferred to Geisler's care on August 11, 1980, for that same problem. She returned to him repeatedly up to and including July 31, 1981, and again on September 21, when diagnosis was made. Geisler ordered the biopsy on that date and performed the surgery himself on October 2.

Thus, under the continuing wrong theory, a factual situation is presented as to whether Geisler's failure to diagnose was a continuing wrong up to and including September 21, 1981. Under the continuing wrong theory the full two-year statute of limitations would commence to run at the end of the continuing wrong, *Frady, supra,* and Ferrell's action would have been timely. It is our opinion that a physician's responsibility to a regular patient, who continued under his care for a specified ailment, is not limited, as a matter of law, to the periods of time the patient is in his presence. It is a factual matter. This is especially true where, as here, reports, histories, laboratory tests (which is a basis for the negligence alleged) are relevant and existent in the physician's file. Additionally, Geisler had prescribed medication to Ferrell on July 31 and had told her to return in six months.

We therefore reverse this cause, and direct the trial court to overrule Geisler's motion for summary judgment.

Judgment reversed.

RATLIFF, C.J., and SULLIVAN, J., concur.