William S. WALTERS, D.O.
Petitioner–Appellant,

v.

Lee RINKER and Delores Rinker,
Respondents–Appellees.

No. 71A03–8706–CV–153.

Court of Appeals of Indiana,
Third District.

March 29, 1988.

☞104(2)

Edward N. Kalamaros, Peter J. Agostino, Edward N. Kalamaros & Associates Professional Corp., South Bend, for petitioner-appellant.

John C. Hamilton, John C. Hamilton, P.C., South Bend, Harzl E. Levine, Levine, Sorkin & Nusbaum, Chicago, Ill., for respondents-appellees.

GARRARD, Presiding Judge.

This is an interlocutory appeal from the denial of William Walters' motion for preliminary determination of his affirmative defense in a medical malpractice action brought by Lee and Delores Rinker. The motion was treated as one for summary judgment by agreement of the parties. The following issues are raised:

1) whether a genuine issue of material fact exists as to whether the two year statute of limitations applicable to medical malpractice actions was tolled under the doctrine of continuing wrong or fraudulent concealment; and

2) whether the two year statute of limitations on medical malpractice actions as applied in this case violates the Indiana Constitution.

We reverse.

■ Summary judgment is appropriate where there exists no genuine issue of material fact and the moving party is entitled

to judgment as a matter of law. Indiana Rules of Procedure, Trial Rule 56(C). In reviewing a grant or denial of summary judgment, we look at the facts which are favorable to the non-moving party and reasonable inferences to be drawn therefrom. *Frady v. Hedgcock* (1986), Ind.App., 497 N.E.2d 620, 622 quoting *Penwell v. Western and Southern Life Insurance Co.* (1985), Ind.App., 474 N.E.2d 1042, 1044.

The facts most favorable to the Rinkers reveal that in the summer of 1983, Lee Rinker complained of pain in his groin area to his family doctor, G.R. Hershberger. Dr. Hershberger referred Rinker to Dr. Mortola who examined Rinker on July 14, 1983 and found a lump in Rinker's right thigh area. On August 3, 1983, Drs. Mortola and Hershberger surgically removed a tumor which was sent to the pathology department of the hospital where the surgery was performed. Dr. Mortola's hospital report described the tumor as "somewhat incapsulated" but "possibly malignant." Dr. William Walters, a pathologist with the hospital, examined the tumor, consulted with other pathologists, and stated in his report that conclusive evidence of malignancy was not present and that changes in the lymph node from the thigh area were of an active rather than a neoplastic nature. On August 16, 1983 Dr. Hershberger received Walters' report and stated in his own notes, "reactive change in [the] lymph node [from the] r[ight] upper thigh no malignancy seen." Dr. Hershberger informed Rinker that the tumor was not malignant. Dr. Hershberger checked Rinker's groin area on October 29, 1984 and noted it was "ok." During December 1984, Rinker began suffering from a recurring cold but neither a chiropractor nor a pulmonary specialist found anything wrong. Rinker's health declined through the spring of 1985 and on March 26, 1985, Rinker's son reported to Dr. Hershberger that Rinker had lost a great deal of weight. Rinker was admitted to Mayo Clinic in March 1985 and on April 5, 1985 was diagnosed as having large cell lymphoma.

The Rinkers filed their proposed complaint against Dr. Walters with the Indiana Insurance Commissioner on July 10, 1986.

Dr. Walters invoked the jurisdiction of the St. Joseph County Superior Court for the limited purpose of considering his motion for preliminary determination of his affirmative defense which was based upon the two year statute of limitations applicable to medical malpractice claims. The parties agreed to treat the motion as one for summary judgment. The trial court denied the motion but granted Dr. Walters' motion for certification of an interlocutory appeal. We granted Dr. Walters' petition for interlocutory appeal.

■■■ Indiana's statute of limitations on medical malpractice actions is an occurrence rather than a discovery statute. IC 16–9.5–3–1(a) (1982 & Supp.1986); *Colbert v. Waitt* (1982), Ind.App., 445 N.E.2d 1000, 1002. Hence suit must be filed within two years from the date the alleged negligent act occurred rather than from when it was discovered. Two doctrines, however, have emerged which purport to relieve some of the hardship of the occurrence nature of our statute. Under the continuing wrong theory, which is applicable where an entire course of conduct combines to produce an injury, the statute of limitations is tolled so that it does not commence running until the continuing wrongful act ceases. *Frady v. Hedgcock* (1986), Ind.App., 497 N.E.2d 620 citing *Montgomery v. Crum* (1928), 199 Ind. 660, 161 N.E. 251. The fraudulent concealment doctrine is applicable where the physician, either by deception or by violation of his fiduciary duty, fails to disclose material information to the patient. *Ferrell v. Geisler* (1987), Ind.App., 505 N.E.2d 137 citing *Spoljaric v. Pangan* (1984), Ind.App., 466 N.E.2d 37 *trans. denied; Nahmias v. Trustees of Indiana University* (1983), Ind.App., 444 N.E.2d 1204 *trans. denied.* The physician's failure to disclose what he knows or reasonably should have known is said to constitute a constructive fraud and operates to toll the statute of limitations until the physician-patient relationship terminates or the patient discovers information which in the exercise of due diligence would lead to discovery of the malpractice. *Id.* citing *Frady v. Hedgcock* (1986), Ind.App., 497

N.E.2d 620; *Spoljaric v. Pangan* (1984), Ind.App., 466 N.E.2d 37 *trans. denied; Nahmias v. Trustees of Indiana University* (1983), Ind.App., 444 N.E.2d 1204 *trans. denied.*

The Rinkers argue that a genuine issue of material fact exists as to whether the doctrine of continuing wrong or the doctrine of fraudulent concealment tolled the statute of limitations in this case so that their suit was timely filed. They base their argument for the applicability of both doctrines upon the concept that Dr. Hershberger, Dr. Mortola and Dr. Walters constituted a therapeutic team of physicians whose relationship with Lee Rinker continued until Lee Rinker was no longer under the care of Dr. Hershberger. For the application of this team theory to the doctrine of continuing wrong, the Rinkers argue that Dr. Hershberger's continued reliance upon Dr. Walters' alleged misdiagnosis constituted a continuing wrong which created an injury by preventing them from discovering Lee had cancer prior to April 5, 1985. For application of the team of physicians theory to the doctrine of fraudulent concealment, the Rinkers argue that as long as Dr. Hershberger continued to rely upon Dr. Walters' alleged misdiagnosis in treating Lee, a physician-patient relationship existed between Dr. Walters and Lee Rinker so that the tolling of the statute of limitations continued until Lee no longer was under Dr. Hershberger's care, presumably in March of 1985. Conversely, Dr. Walters argues that the doctrines of continuing wrong and fraudulent concealment are not applicable to this case because no physician-patient relationship existed between himself and Lee Rinker or, if one did exist, it terminated on August 3, 1983 when he diagnosed the tumor. This court must therefore determine the nature and duration of the relationship between a pathologist who diagnoses a tumor and the person from whom it is removed when the tumor is sent to the pathologist by the person's family doctor.

■ Dr. Walters first contends that he did not examine, see, treat or prescribe medication for Lee Rinker, one of which acts he argues is a prerequisite for the existence of a physician-patient relationship under the holding of *Johnson v. Padilla* (1982), Ind.App., 433 N.E.2d 393. *Johnson,* however, does not stand for the proposition that a physician must examine, see, treat or prescribe medication in order for a physician-patient relationship to exist. In *Johnson,* this court merely held that a supervising physician who did no more than approve a subordinate's *decision* to operate was entitled to summary judgment on a complaint which alleged that the operation was negligently *performed.* We have discovered no medical malpractice cases which hold that a physician must physically examine, treat or prescribe medication for another person in order for a physician-patient relationship to exist. Furthermore, the following language from our medical malpractice statute indicates that such actions are not required in order for liability to be imposed:

> "Malpractice" means any tort or breach of contract based on health care or professional services rendered, or which should have been rendered, by a health care provider, to a patient.
>
> "Health care" means *any act,* or treatment performed or furnished, by any health care provider....

IC 16–9.5–1–1(h, i) (1982 and Supp.1986) (emphasis added). Nothing in the statute limits its applicability to examining, treating or prescribing medication. The statute covers *any act* performed by a health care provider as such. In this case, the act consisted of examining and diagnosing the tumor removed from Lee Rinker and it was clearly performed for the purpose of diagnosing and/or treating Rinker. Hence, Dr. Walters' argument that he did not perform an act sufficient to establish a physician-patient relationship with Lee Rinker must fail.

■ Dr. Walters also argues that consent is a prerequisite to the establishment of a physician-patient relationship and because Lee Rinker did not personally seek his assistance no such relationship existed in this case. Dr. Walters relies upon this court's decision in *Ahnert v. Wildman*

(1978), 176 Ind.App. 630, 376 N.E.2d 1182, in support of this argument. *Ahnert,* however, is factually distinguishable from this case and is inapplicable.

In *Ahnert,* a company physician examined an employee to determine the employee's fitness to return to work after the employee had been released by his attending physician. Although the company physician did not give his approval until five months after the employee had been discharged from the hospital, he nevertheless refused to complete insurance forms which required the signature of the attending physician. The employee sued for benefits he did not receive for the five month period. In affirming the trial court's grant of summary judgment in favor of the company and its physician, the court noted that the "physician-patient relationship is a consensual one, wherein the patient knowingly seeks the assistance of a physician and the physician knowingly accepts him as a patient." *Id.* 376 N.E.2d at 1185 citing *Findlay v. Board of Supervisors of Mohave County* (1951), 72 Ariz. 58, 230 P.2d 526. In *Ahnert* the physician had not accepted Ahnert as a patient. One of the duties imposed upon "treating" physicians which is not imposed upon "examining" physicians is filling out insurance forms. *Id.*

While Dr. Walters contends that the relationship between himself and Rinker was a non-consensual one because Rinker did not personally seek Dr. Walters' assistance, at least three Indiana cases support the conclusion that a consensual relationship between a physician and a patient may exist where others have contracted with the physician on the patient's behalf. *See Scruby v. Waugh* (1985), Ind.App., 476 N.E.2d 533 (physician-patient relationship existed for the purposes of medical malpractice action where estranged wife contracted with physician who signed commitment papers); *Detterline v. Bonaventura* (1984), Ind. App., 465 N.E.2d 215 (physician-patient relationship existed for purposes of malpractice action where wife contracted with physician who signed commitment papers); *Gooley v. Moss* (1979), Ind.App., 398 N.E.2d 1314 (physician-patient relationship existed

for purposes of medical malpractice action where county department of public welfare contracted with physician to perform surgery upon a ward of the department).

No Indiana cases have been located which directly hold that a consensual physician-patient relationship exists where a family doctor contracts with a pathologist to diagnose a tumor removed from the patient's body. The important fact in determining whether the relationship is a consensual one, however, is not who contracted for the service but whether it was contracted for with the express or implied consent of the patient or for his benefit. Hence, in *Ahnert,* no consensual relationship existed because the examination was required by the employer for its benefit rather than the employee's. Where, as in *Scruby, Detterline* and *Gooley,* however, healthcare services are rendered on behalf of the patient, and are done for the patient's benefit, a consensual physician-patient relationship exists for the purposes of medical malpractice. This conclusion is consistent with our statute which defines malpractice as a tort or breach of contract based upon health care and then defines health care as "any act or treatment performed or furnished by any health care provider for, to, or *on behalf* of a patient...." IC 16–9.5–1–1(h, i) (1982 & Supp.1986) (emphasis added). In this case, Dr. Walters may have examined the tumor at Dr. Hershberger's request but the request was made upon Lee Rinker's behalf and the examination and diagnosis was to inure to Lee Rinker's benefit. A consensual physician-patient relationship therefore existed between Dr. Walters and Lee Rinker.

■ Having determined that the nature of Dr. Walters' and Lee Rinker's relationship was one of physician and patient, we must determine the duration of that relationship. Dr. Walters contends that the relationship terminated when he examined the tumor and made his report. The Rinkers argue that because Dr. Hershberger relied upon Dr. Walters' diagnosis, he was part of a therapeutic team of physicians whose relationship with Lee Rinker did not

terminate until Rinker was no longer under the care of Dr. Hershberger. Although Indiana apparently has not previously considered whether the medical malpractice statute of limitations is tolled by the primary physician's continued reliance upon a pathologist's diagnosis, New York has considered the issue on several occasions. While early cases from that jurisdiction accepted the team of physicians theory for purposes of tolling the statute of limitations, more recent cases have rejected it absent the existence of a continuing agency relationship between the primary physician and the pathologist.

In *Fonda v. Paulsen* (1975), N.Y.App. Div., 46 A.D.2d 540, 363 N.Y.S.2d 841, a New York appellate court reversed the dismissal of a medical malpractice action brought against the patient's primary physicians and the pathologist upon whose diagnosis the primary physicians relied. In reversing the dismissal of the claim against the pathologist, the court stated:

In the somewhat unique circumstances presented in the case at bar, where the pathologist should have reasonably expected that his work would be relied upon by other practitioners in determining the mode of treatment, we feel it appropriate to impute to that pathologist or diagnostician constructive participation in that treatment so long as it continued. In this way, the practitioner guilty of the initial malpractice is subject to the same limitations as those who continued the malpractice as a reasonably forseeable result of the initial wrong.

*Id.* at 545, 363 N.Y.S.2d at 846. The theory of imputing constructive participation in the patient's treatment to the pathologist continued to be accepted by New York courts until 1982. *See McDermott v. Torre* (1981), 82 A.D.2d 152, 441 N.Y.S.2d 445, *modified* (1982) 56 N.Y.2d 399, 452 N.Y.S. 2d 351, 437 N.E.2d 1108; *Walpole v. Whitsell* (1981), 110 Misc. 2d 508, 442 N.Y.S.2d 762. In 1982, however, the New York Court of Appeals addressed the issue and concluded:

The policy underlying the continuous treatment doctrine seeks to maintain the physician-patient relationship in the belief that the most efficacious medical care will be obtained when the attending physician remains on the case from onset to cure. Implicit in the policy is the recognition that the doctor not only is in a position to identify and correct his or her malpractice, but is best placed to do so.

These considerations do not apply to an independent laboratory. In this context, the inquiry must be directed to the laboratory's relationship to the patient. Generally, a laboratory neither has a continuing or other relevant relationship with the patient nor, as an independent contractor, does it act as an agent for the doctor or otherwise act in relevant association with the physician. A laboratory does not have the opportunity to discover an error in a report. Instead, it must rely upon the treating physician to discover any diagnostic mistake. Therefore, the policy underlying the continuous treatment doctrine generally will not apply to the independent laboratory.

*McDermott v. Torre* (1982), 56 N.Y.2d 399, 408, 452 N.Y.S.2d 351, 355, 437 N.E.2d 1108, 1112. The New York Court of Appeals later extended the holding of *McDermott* by rejecting the application of the continuous treatment theory to a case in which the suit was brought against a pathologist who worked for a hospital rather than an independent laboratory. *Meath v. Mishrick* (1986), 68 N.Y.2d 992, 510 N.Y.S. 2d 560, 503 N.E.2d 115. *See also Modzelewski v. Kingsbrook Jewish Medical Center* (1986), 120 A.D.2d 498, 501 N.Y.S.2d 699.

It is clear from the parties' briefs that Dr. Walters was an employee of the hospital and not in any continuing agency or other relevant relationship with Dr. Hershberger. We are persuaded of the soundness of the analysis in *McDermott* and the subsequent New York decisions. To adopt the contrary view would constitute an evasion of the occurrence statute based on no rational ground.

A physician-patient relationship existed between Dr. Walters and Lee Rinker.

That relationship, however, terminated with the last act of health care Dr. Walters provided on Rinker's behalf. In this case, that act occurred on August 10, 1983 when Dr. Walters signed his report and sent it to Dr. Hershberger. As the relationship terminated on August 10, 1983, the statute of limitations was not tolled until suit was filed under the Rinkers' arguments regarding the doctrines of continuing wrong and fraudulent concealment. The Rinkers' suit therefore was barred as of August 11, 1985. It follows that the trial court erred in denying Dr. Walters' motion for preliminary determination of an affirmative defense.[1]

 Because we have held the trial court erred in denying Dr. Walters' motion, we must address the constitutional argument raised by the Rinkers that the statute's application to them would be unconstitutional. The Rinkers contend that precluding them from bringing an action where the "nature of the concealment compromised deeply their ability to bring suit within a timely fashion" would violate Article I, Section 12 of the Indiana Constitution. That section, in pertinent part, provides:

> All courts shall be open and every person for injury done to him in his person ... shall have a remedy by due course of law.

Ind. Const. Art. I, Sec. 12. In this case, however, no concealment by Dr. Walters was present. Fraudulent concealment is applicable where a physician by deception or breach of fiduciary duty fails to disclose material information. *Ferrell v. Geisler* (1987), Ind.App., 505 N.E.2d 137 citing *Spoljaric v. Pangan* (1984), Ind.App., 466 N.E.2d 37 *trans. denied; Nahmias v. Trustees of Indiana University* (1983), Ind.App., 444 N.E.2d 1204 *trans. denied.* The Rinkers never have contended that Dr. Walters actively deceived them regarding his alleged act of malpractice. They simply have argued that Dr. Walters reasonably should have known that his diagnosis was incorrect and that he should have disclosed that information by virtue of his fiduciary relationship with Lee Rinker. The duty to disclose such information, however, ceases with the termination of the physician-patient relationship. *Id.* citing *Frady v. Hedgcock* (1986), Ind.App., 497 N.E.2d 620; *Spoljaric v. Pangan* (1984), Ind.App., 466 N.E.2d 37 *trans. denied; Nahmias v. Trustees of Indiana University* (1983), Ind.App., 444 N.E.2d 1024 *trans. denied.* Because Dr. Walters' and Lee Rinker's relationship terminated on August 10, 1983, no concealment existed after that date. Concealment therefore did not preclude the Rinkers from bringing suit in a timely fashion. The challenger bears the burden of proving that a statute is unconstitutional. *Johnson v. St. Vincent Hospital* (1980), 273 Ind. 374, 404 N.E.2d 585 (citations omitted). The Rinkers have failed to meet this burden.[2]

Reversed and remanded with instructions to grant judgment on the motion for preliminary determination of an affirmative defense.

HOFFMAN and NEAL, JJ., concur.

---

1. It should also be noted that in any event, the Rinkers discovered the cancer, and thus the potential malpractice, April 5, 1985, some four months before the expiration of two years from the date of the alleged occurrence. Because of our resolution of the team theory, we need not determine whether four months was a reasonable time as a matter of law within which to have commenced an action. *See Spoljaric v. Pangan* (1984), Ind.App., 466 N.E.2d 37, *transfer denied.*

2. We also note that under the fraudulent concealment doctrine the plaintiff must file his claim within a reasonable time after acquiring information which in the exercise of due diligence would lead to the discovery of the malpractice. *Ferrell v. Geisler* (1987), Ind.App., 505 N.E.2d 137 citing *Frady v. Hedgcock* (1986), Ind. App., 497 N.E.2d 620; *Spoljaric v. Pangan* (1984), Ind.App., 466 N.E.2d 37 *trans. denied; Nahmias v. Trustees of Indiana University* (1983), Ind.App., 444 N.E.2d 1204, *trans. denied.* In this case, the very latest date on which Lee Rinker possessed such information would have been April 5, 1985 when he was diagnosed at the Mayo Clinic as having cancer. The Rinkers, however, did not file a claim until July 10, 1986. Fifteen months does not appear to be a reasonable time under the facts of this case.