John E. MOYER and Angela R. Moyer, Appellants–Plaintiffs,

v.

THREE UNNAMED PHYSICIANS FROM MARION COUNTY AND DE-LAWARE COUNTY, INDIANA, Hoff-man–LaRoche, Inc., and Roche Labo-ratories, Inc., Appellees–Defendants.

No. 49A02–0504–CV–306.

Court of Appeals of Indiana.

April 13, 2006.

James H. Young, Young & Young, Indianapolis, Michael D. Hook, Hook Bolton Mitchell, Kirkland & McGhee, P.A., Pensacola, FL, for Appellants.

Marilyn A. Young, Edna M. Koch, Zeigler Cohen & Koch, Indianapolis, for Appellee Alexander Zemstov, M.D.

Michael Roth, Eichhorn & Eichhorn, Carmel, for Appellee Tsu–Yi Chuang, M.D.

## OPINION

CRONE, Judge.

### Case Summary

John E. Moyer and Angela R. Moyer (collectively, "the Moyers") appeal the trial court's order of summary judgment in favor of Alexander Zemtsov, M.D., and Tsu–Yi Chuang, M.D. We affirm.

### Issue

We consolidate and restate the two issues presented by the Moyers as whether the trial court erred in granting summary judgment in favor of Dr. Zemtsov and Dr. Chuang.

### Facts and Procedural History

The facts most favorable to the Moyers as nonmovants are as follows: In January 2000, twenty-eight-year-old John sought medical treatment from Dr. Zemtsov, a dermatologist practicing in Muncie, Indiana. When John first visited Dr. Zemtsov on January 14, 2000, Dr. Zemtsov prescribed Accutane for John's acne. Accutane is a prescription drug distributed by Hoffman–LaRoche, Inc., for treatment of severe recalcitrant nodule acne.[1] Dr. Zemtsov advised John that Accutane "could affect" his trigliyceride and cholesterol levels and that elevated cholesterol and triglyceride levels "are sometimes associated with heart disease." Appellants' App. at 176 (affidavit of Dr. Zemtsov). John's cholesterol and triglyceride levels were elevated before Dr. Zemtsov prescribed Accutane, and another physician, Debbie Heck, M.D., had prescribed drugs to lower these levels. John had several follow-up visits with Dr. Zemtsov, the last of which was on May 2, 2000. During the time that he treated John, Dr. Zemtsov ordered six blood tests to monitor John's cholesterol and triglyceride levels. On February 4, 2000, Dr. Zemtsov's staff informed John that his triglycerides were "high" and that he should "watch his diet and decrease his dose of Accutane." *Id.* at 177, 202. Other than on February 4, 2000,

---

1. *See* Roche Pharmaceuticals in the U.S., Our Products at rocheusa.com/products/accu- tane/pi.pdf (last visited March 13, 2006).

John's cholesterol and triglyceride levels were consistently lower while he was under Dr. Zemtsov's care than they had been prior to taking Accutane.

John also sought treatment for his acne from Dr. Chuang, a dermatologist practicing at the Indiana University Medical Center in Indianapolis. John first visited Dr. Chuang on April 13, 2000, and Dr. Chuang prescribed Accutane and continued to see John through November 14, 2000. At some time between November 14, 2000, and November 15, 2001, John stopped taking Accutane, but it is unclear from the record exactly when he did so. On November 15, 2001, John had quadruple bypass open-heart surgery after being diagnosed with coronary artery disease. Several months later, on May 1, 2002, John went to the emergency room at Ball Memorial Hospital in Muncie because he was experiencing severe chest pain. While at the hospital, a physician, referred to only as "Dr. Feliciano" in the record, informed John that there may have been a link between his premature heart disease and his use of Accutane. Dr. Feliciano, believed by John to be a resident or intern, told John that he was planning to perform a study on this issue, and he asked John to participate in it. John agreed and allowed Dr. Feliciano to take photographs of his acne at the hospital that day, but he never heard from Dr. Feliciano again.

After John's conversation with Dr. Feliciano on May 1, 2002, the Moyers began to "wonder" whether Dr. Zemtsov and/or Dr. Chuang had committed malpractice. Appellants' Br. at 5. In the spring of 2003, the

Moyers met with an attorney who advised them that John's physicians "may have committed malpractice." Appellants' App. at 95–97 (affidavits of John Moyer and Angela Moyer). On November 17, 2003, the Moyers filed a proposed complaint for medical negligence with the Indiana Department of Insurance, naming, *inter alia*, Dr. Zemtsov and Dr. Chuang as defendants.[2] That same day, they filed suit against Dr. Zemstov and Dr. Chuang in Marion Superior Court.

On November 3, 2004, Dr. Zemtsov filed a motion for preliminary determination of law and for summary judgment, arguing that the Moyers' complaint was barred by the two-year statute of limitations of Indiana's medical malpractice act set forth in Indiana Code Section 34–18–7–1. On December 18, 2004, Dr. Chuang filed his motion for summary judgment, also arguing that the Moyers failed to file their complaint within the time permitted by the statute of limitations. On January 6, 2005, the Moyers filed their response to the motions for summary judgment, claiming that the statute of limitations was unconstitutional as applied to them. In late January 2005, the physicians filed their replies. On March 9, following a hearing, the trial court granted Dr. Zemstov's and Dr. Chuang's motions for summary judgment. On March 28, 2005, the court entered a final appealable order granting summary judgment to Dr. Zemstov and Dr. Chuang. The Moyers now appeal.

### Discussion and Decision

The Moyers argue that the trial court erred in granting summary judg-

---

2. Because the defendants are "health care providers" as defined by the Indiana Medical Malpractice Act, the Moyers were required to file a proposed complaint with IDOI in order to bring suit against the defendants in the trial court. *See* Ind.Code §§ 34–18–2–14, –8–4, 8–7. In the lawsuit, the Moyers also named Dr. Debbie Heck, who treated John for elevated triglyceride and cholesterol levels, as well as Hoffman–LaRoche, Inc., and Roche Laboratories, Inc., the distributor and manufacturer of Accutane. These three defendants are not involved in this appeal.

ment in favor of Dr. Zemstov and Dr. Chuang. Our standard of review is well settled.

A motion for preliminary determination, when accompanied by evidentiary matters, is akin to a motion for summary judgment and is subject to the same standard of appellate review as any other summary judgment disposition. Upon review of a summary judgment determination, we apply the same standard applied by the trial court: where the evidence shows that there are no genuine issues of material fact and the moving party is entitled to a judgment as a matter of law, summary judgment is appropriate. We construe all facts and reasonable inferences drawn therefrom in a light most favorable to the non-moving party.

Where a party asserts the statute of limitation as an affirmative defense and makes a prima facie showing that the action was commenced beyond the statutory period, the burden shifts to the non-movant to establish an issue of fact material to a theory that avoids the defense. Additionally, when material facts are not in dispute, our review is limited to determining whether the trial court correctly applied the law to the undisputed facts. When there are no disputed facts with regard to a motion for summary judgment and the question presented is a pure question of law, we review the matter de novo.

*Jacobs v. Manhart,* 770 N.E.2d 344, 348–49 (Ind.Ct.App.2002) (citations and quotation marks omitted), *trans. denied.*

Dr. Zemstov and Dr. Chuang contend that the Moyers' claims against them are time-barred by the statute of limitations. Indiana's medical malpractice act includes a statute of limitations that states in pertinent part,

> A claim, whether in contract or tort, may not be brought against a health care provider based upon professional services or health care that was provided or that should have been provided unless the claim is filed within two (2) years after the date of the alleged act, omission, or neglect.

Indiana Code § 34–18–7–1(b). Indiana courts have consistently held that this two-year period begins to run when the negligence occurs, not when it is discovered. *See, e.g., Levy v. Newell,* 822 N.E.2d 234, 236 (Ind.Ct.App.2005), *trans. denied; LeBrun v. Conner,* 702 N.E.2d 754, 757 (Ind. Ct.App.1998). Our supreme court has found application of the statute of limitations unconstitutional, however, where it would preclude the filing of a claim before a plaintiff discovers the malpractice and resulting injury or facts that, in the exercise of reasonable diligence, should lead to the discovery of the malpractice and the resulting injury. *Martin v. Richey,* 711 N.E.2d 1273, 1284 (Ind.1999); *Van Dusen v. Stotts,* 712 N.E.2d 491, 497 (Ind.1999).

In the recent case of *Booth v. Wiley,* 839 N.E.2d 1168 (Ind.2005), our supreme court outlined the methodology that should be followed in applying the medical malpractice statute of limitations:

> Initially, a court must determine the date the alleged malpractice occurred and determine the discovery date—the date when the claimant discovered the alleged malpractice and resulting injury, or possessed enough information that would have led a reasonably diligent person to make such discovery. If the discovery date is more than two years beyond the date the malpractice occurred, the claimant has two years after discovery within which to initiate a malpractice action. But if the discovery date is within two years following the occurrence of the alleged malpractice,

the statutory limitation period applies and the action must be initiated before the period expires, unless it is not reasonably possible for the claimant to present the claim in the time remaining after discovery and before the end of the statutory period. In such cases where discovery occurs before the statutory deadline but there is insufficient time to file, we have not previously addressed how much time should be permitted. But because [our holding in *Boggs v. Tri–State Radiology, Inc.*, 730 N.E.2d 692, 697–98 (Ind.2000) ] permits such an action to be commenced after the statutory two-year occurrence-based period when timely filing is not reasonably possible, we hold that such claimants must thereafter initiate their actions within a reasonable time.

*Id.* at 1172.[3]

Because Dr. Zemstov and Dr. Chuang provided medical care to John during different time periods, we will apply this methodology to the circumstances of John's treatment by each of the physicians.

### I. Dr. Zemstov

 The parties appear to concede, and we agree, that the occurrence date for Dr. Zemstov's alleged malpractice was May 12, 2000. Although Dr. Zemstov first saw John and first prescribed Accutane on January 14, 2000, Dr. Zemstov continued to prescribe Accutane and monitor John's tolerance of the drug during several follow-up visits, the last of which was on May 12, 2000. In certain circumstances, the doctrine of continuing wrong will permit a patient to bring a medical malpractice action within two years after the date of the patient's last encounter with the physician. *Follett v. Davis*, 636 N.E.2d 1282, 1284 (Ind.Ct.App.1994), *trans. denied* (1995). For example, if a physician fails to diag-

nose a medical condition over the course of more than one patient visit, then this is considered an "entire course of conduct" that combines to produce a wrong. *See, e.g., Havens v. Ritchey*, 582 N.E.2d 792, 795 (Ind.1991). Similarly, in this case, Dr. Zemstov allegedly committed malpractice by prescribing Accutane for John. Although he initially prescribed the medication on January 14, 2000, Dr. Zemstov continued seeing John as his patient through May 12, 2000. During that time, Dr. Zemstov monitored John's cholesterol and trygliceride levels and ordered John to reduce his dosage of Accutane after discovering an increase in those levels. Thus, Dr. Zemstov's continued treatment of John, specifically his continued review of John's response to Accutane—if it was in fact negligent—would amount to a continuing wrong that triggered the statute of limitations as to John's claim against Dr. Zemstov on May 12, 2000, at the latest.

Next, we must determine the discovery date. In doing so, we construe all facts in favor of the Moyers as nonmovants. *See Levy*, 822 N.E.2d at 238. As our supreme court stated in *Booth*, the discovery date is "the date when the claimant discovered the alleged malpractice and resulting injury, *or possessed enough information that would have led a reasonably diligent person to make such discovery.*" 839 N.E.2d at 1172 (emphasis added). The latter prong is at issue in the instant case. The Moyers argue that they did not possess enough information that would have led a reasonably diligent person to discover the alleged malpractice by Dr. Zemtsov until "spring of 2003," when a lawyer advised John that "malpractice was a possibility." Appellants' Br. at 15. Dr. Zemtsov argues that John possessed sufficient information

---

**3.** *Booth* was decided after the briefs were filed in this appeal. Each of the parties filed a notice of additional authority, citing *Booth* as supportive of his position.

when he underwent bypass surgery on November 15, 2001. In the alternative, he contends that at the very latest, John possessed enough information when Dr. Feliciano informed him on May 1, 2002, of the possible link between his heart disease and his use of Accutane.

Although Dr. Zemstov told John that Accutane could increase his triglyceride and cholesterol levels and that these increased levels are sometimes associated with heart disease, the Moyers argue that other facts surrounding Dr. Zemstov's treatment of John would have misled or confused the average person as to the potential risks related to heart disease. For example, Dr. Zemstov found that John had high cholesterol and triglyceride levels before he ever took Accutane, and, with the exception of one test in February 2000, Dr. Zemstov consistently found John's levels to be lower while he was on Accutane than they had been before he started taking the drug. When they were elevated in February 2000, Dr. Zemstov's office advised John to "watch his diet and decrease his dose of Accutane." Appellants' App. at 177. Also, John stopped taking Accutane "several months" prior to his bypass surgery. Appellants' Br. at 14. Construing the facts and the reasonable inferences therefrom in a light most favorable to the Moyers, we agree that—based upon John's history of high cholesterol and triglyceride levels prior to taking Accutane, Dr. Zemstov's communications to him about his levels while on the drug, and the passage of time between John's use of Accutane and his diagnosis of heart disease—John may not have had enough information that would have led a reasonably diligent person to discover the alleged malpractice by Dr. Zemstov.

 However, in May 2002, John met Dr. Feliciano in a hospital emergency room, and upon learning of John's heart disease and past use of Accutane, Dr. Feliciano informed John that there may be a link between the two and asked him to participate in a medical study on that very issue. The Moyers argue that following John's conversation with Dr. Feliciano, they still had only a "lay suspicion" that there may have been malpractice, which is not sufficient to trigger the two-year statute of limitations. *Van Dusen,* 712 N.E.2d at 499. The Moyers claim that they did not have "actual" and "subjective" knowledge of the alleged malpractice until the spring of 2003, when they consulted with an attorney. Appellants' Br. at 7, 15. However, a plaintiff need not know with certainty that malpractice caused his injury in order to trigger the statute. *Van Dusen,* 712 N.E.2d at 499. Our supreme court outlined an example similar to the instant case in *Van Dusen:*

> Moreover, when it is undisputed that plaintiff's doctor has expressly informed a plaintiff that he has a specific injury and that there is a reasonable possibility, if not a probability, that the specific injury was caused by a specific act at a specific time, then the question may become one of law. Under such circumstances, generally a plaintiff is deemed to have sufficient facts to require him to seek promptly any additional medical or legal advice needed to resolve any remaining uncertainty or confusion he may have regarding the cause of his injury and any legal recourse he may have, and his unexplained failure to do so should not excuse a failure to timely file a claim.

*Id.* It is unclear whether Dr. Feliciano actually treated John in the emergency room or simply talked with John about the possible connection between his heart disease and Accutane because of the medical study he was planning. Whichever is the case, Dr. Feliciano may not fall within the

definition of "plaintiff's physician" as our supreme court intended in *Van Dusen.* 712 N.E.2d at 499. Nonetheless, we conclude that Dr. Feliciano's conversation with John was relevant to the discovery date determination in this case because the doctor offered a medical opinion that was based upon knowledge of John's past use of Accutane and his heart disease. Further, this conversation was conducted in a hospital as John received medical treatment related to his heart. Even if the Moyers continued to have doubts about the cause of John's heart disease or the possibility of malpractice, the information provided by Dr. Feliciano was sufficient to require them to promptly seek additional medical and legal advice to assist them in deciding whether to seek legal recourse. *Id.* Thus, we conclude that May 1, 2002, was the Moyers' discovery date, because it was on that date that Dr. Feliciano informed John of a possible link between his heart disease and Accutane.

██ Because the discovery date occurred within two years following the occurrence of the alleged malpractice by Dr. Zemstov, the limitations period applies, and John was required to initiate the action within that two-year period unless it was not "reasonably possible." *Booth,* 839 N.E.2d at 1172. Here, the Moyers' discovery date was May 2, 2002, and the statute of limitations period ended on May 12, 2002, two years after John's last visit to Dr. Zemstov. This left the Moyers with only eleven days in which to investigate the alleged malpractice, obtain counsel, and file suit. Clearly, it was not reasonably possible for the Moyers to file their claim within this extremely short time period.

Although we find that there was insufficient time for the Moyers to file their claim prior to the expiration of the limitations period, they were still required to initiate their action against Dr. Zemstov "within a reasonable time." *Id.* The Moyers filed their complaint in November 2003, more than eighteen months after John's conversation with Dr. Feliciano. In our view, this delay was unreasonable, particularly considering John's admission that his conversation with Dr. Feliciano caused him to wonder about the possibility of Dr. Zemstov's malpractice. *See, e.g., Walters v. Rinker,* 520 N.E.2d 468, 474 n. 2 (Ind. Ct.App.1988) (fifteen months was unreasonable delay in filing suit after discovery of alleged malpractice), *trans. denied; Spoljaric v. Pangan,* 466 N.E.2d 37, 45 (Ind.Ct.App.1984) (fourteen-month delay was unreasonable), *trans. denied* (1985). We agree with Dr. Zemstov that the issue of when the Moyers obtained legal advice is not relevant to the discovery date determination. If that were the case, plaintiffs would be free to "wonder" indefinitely—in this case, the Moyers apparently wondered for a full year—before seeking legal counsel to pursue a claim. To say the least, this standard would be unfair and impractical, rendering the statute of limitations meaningless.

In sum, while the Moyers' claim was not automatically barred by the two-year statute of limitations that expired on May 12, 2002, they forfeited their claim against Dr. Zemstov by not acting within a reasonable time following the statute's expiration. The trial court did not err in granting Dr. Zemstov's motion for summary judgment.

## II. Dr. Chuang

██ John first visited Dr. Chuang on April 13, 2000. Dr. Chuang also prescribed Accutane to treat John's acne, and John continued to see him until a final visit on November 14, 2000. As explained above with regard to Dr. Zemstov, the time period during which Dr. Chuang treated John could be viewed as an alleged continuing wrong. *Havens,* 582 N.E.2d at

795. Because their doctor/patient relationship ended on November 14, 2000, that date would be considered the last date that the alleged malpractice occurred for purposes of determining the statute of limitations period. Under Indiana Code Section 34–18–7–1, then, the medical malpractice limitations period expired no later than November 14, 2002.

█ As was also discussed above, we find that the Moyers' discovery date was May 1, 2002, approximately six months before the expiration of the limitations period. Following the methodology laid out in *Booth*, the Moyers were required to file their claim against Dr. Chuang on or before November 14, 2002, unless it was not reasonably possible for them to do so. *Booth*, 839 N.E.2d at 1172. In our view, it was reasonably possible for the Moyers to file their claim within six and one-half months after John's conversation with Dr. Feliciano. *See, e.g., Burns v. Hatchett*, 786 N.E.2d 1178, 1184 (Ind.Ct.App.2003) (where plaintiff discovered alleged malpractice ten months before expiration of statute of limitations, it was reasonably possible for him to file complaint within limitations period), *trans. denied; Boggs v. Tri–State Radiology, Inc.*, 730 N.E.2d 692, 699 (Ind.2000) (it was reasonably possible for plaintiff to file suit within eleven months between discovery of alleged malpractice and expiration of statute of limitations).

As the Moyers point out, we have found in at least one case that it was a practical impossibility for a plaintiff to file her medical malpractice complaint within six months of the discovery date. *See Jacobs*, 770 N.E.2d at 355. In *Jacobs*, the plaintiff received an initial diagnosis of cervical cancer eighteen months after her physician's alleged malpractice, or in other words, six months prior to the expiration of the two-year limitations period. *Id.* at 354–55.

Facing a life-threatening illness, the plaintiff had to get a second opinion, undergo and recover from a radical hysterectomy, seek informal and formal medical opinions, and file suit. Considering the totality of the circumstances, we determined that the application of the occurrence-based statute of limitations would deny her a meaningful opportunity to pursue her claim. *Id.* at 355.

The circumstances in the instant case are clearly distinguishable from those in *Jacobs*. Most notably, John was not in the midst of fighting for his life when he discovered the alleged malpractice. When John learned of the possible link between his use of Accutane and his heart disease in May 2002, almost six months had passed since his diagnosis of heart disease and open-heart surgery. After his conversation with Dr. Feliciano, John had six months to seek additional medical and legal advice, obtain counsel, and file suit against Dr. Chuang. Thus, viewing the totality of the circumstances in this case, we conclude that John had a meaningful opportunity to pursue his claim within the six months remaining in the limitations period.

Even if we were to agree with the Moyers' argument that the occurrence-based statute is unconstitutional as applied to them, we would reach the same result of affirming the trial court's summary judgment order. As explained in *Booth*, claimants that discover alleged malpractice before the statutory deadline with insufficient time to file suit, must initiate their actions within a reasonable time. 839 N.E.2d at 1172. As discussed above with regard to the Moyers' claim against Dr. Zemstov, eighteen months passed between the discovery date—May 1, 2002—and the date upon which the Moyers filed

their malpractice complaint—November 17, 2003. In our view, this delay was unreasonable.

In sum, the trial court did not err in entering summary judgment in favor of Dr. Chuang and Dr. Zemstov.

Affirmed.

FRIEDLANDER, J., concurs.

MAY, J., concurs in result.