Barbara GILINSKY, Plaintiff,

v.

Joseph Rosario INDELICATO,
D.C., Defendant.

No. 93–CV–893 (JS).

United States District Court,
E.D. New York.

July 28, 1995.

Alexander J. Drago, Porzio, Bromberg & Newman, P.C., New York City, for plaintiff.

Joseph J. Rava, Killarney & Salmon, New York City, for defendant.

## MEMORANDUM AND ORDER

SEYBERT, District Judge:

In the instant personal-injury action founded upon diversity jurisdiction, plaintiff Barbara Gilinsky brings suit against the defendant, Dr. Joseph Rosario Indelicato, alleging that his negligent conduct contributed to the injuries she sustained on September 24, 1990. The plaintiff alleges that, on that day, she suffered a stroke while under the chiroprac-tic care and treatment of an individual named Dr. Kevin Parks. Unaware of the severity of the plaintiff's condition, Dr. Parks called the defendant for consultative advice. According to the plaintiff, the defendant's failure to recommend emergent medical treatment during a series of seven conversations with Dr. Parks, that traversed a period of approximately five hours, constituted a breach of the defendant's duty of care.[1]

The defendant now moves for summary judgment dismissing the plaintiff's complaint in its entirety on the ground that a physician-patient relationship did not exist between the parties. For the reasons that follow, the defendant's motion is denied.

## FACTUAL BACKGROUND

Viewed in the light most favorable to the plaintiff, the record shows that on September 24, 1990, plaintiff Barbara Gilinsky visited the office of Dr. Kevin Parks, a chiropractor in Wall Township, New Jersey. She arrived at his office at approximately 9:10 a.m. and immediately was seen by the doctor. During the preceding five years, Dr. Parks had treated Ms. Gilinsky on several occasions without encountering difficulty. On the day in question, however, Dr. Parks performed an adjustment of her neck, which precipitated an intense headache, nausea, vomiting, dizziness, a loss of balance, slurred speech, and visual disturbances.

The plaintiff's symptoms were unusual to Dr. Parks and he was greatly concerned. As such, Dr. Parks decided to telephone Dr. Indelicato to discuss the plaintiff's condition with him.

At the time of the incident in question, Dr. Parks was enrolled in a post-doctoral chiropractic neurology residency program sponsored by the New York College of Chiropractic. Dr. Indelicato was assigned as Dr. Parks' senior neurologist to monitor his progress and help him through any difficulties that he encountered during the neurology residency. Dr. Indelicato's responsibility

---

1. In February 1991, the plaintiff in the instant action filed suit against Dr. Kevin Parks, her treating chiropractor, in New Jersey state court, alleging that Parks' negligent treatment caused her to sustain serious personal injuries. This matter ultimately was settled between the parties to that action.

in this capacity arose as a condition to maintaining the status of diplomate in neurology at the New York College of Chiropractic; to retain his diplomate status, he was required to stay active in chiropractic neurology by volunteering to answer the questions of new students enrolled in the course. Dr. Parks regularly communicated with Dr. Indelicato by mail, sending him weekly reports of his examinations. Prior to the subject incident, the two doctors had previously spoken by telephone; one such discussion concerned the treatment of a teenage girl who suffered from back pain.

At 10:18 a.m., while the plaintiff rested with her head on Dr. Parks' desk, Dr. Parks placed a telephone call to Dr. Indelicato at his office in Commack, New York. According to telephone records, this first call lasted 9 minutes. In this call, Dr. Parks identified himself, stated that there was an emergency, and asked to speak with Dr. Indelicato. Dr. Parks told the defendant that he had a patient in his office, advised him of her vital signs and symptoms, and that the symptoms ensued after chiropractic manipulation. The defendant expressed an opinion that the plaintiff was suffering from cervical disequilibrium. He instructed Dr. Parks to perform gentle-range-of-motion testing, and to use electrical stimulation and high-volt galvanism. Dr. Parks documented the defendant's advice in his office records and followed the instructions after the first telephone call was completed. The plaintiff's speech then became noticeably slurred, and she momentarily blacked out as she rested on a sofa bed.

A second, 10-minute conversation occurred when Dr. Parks called the defendant at 11:18 a.m. During this telephone conversation, Dr. Parks updated the defendant on the case and the defendant advised him to treat the plaintiff with ultrasound. Dr. Parks followed this advice.

A third conversation occurred when Dr. Indelicato telephoned Dr. Parks at 12:25 p.m.; according to Dr. Indelicato's telephone records, this call lasted 7 minutes. During the next three hours, Dr. Parks and Dr. Indelicato spoke on four additional occasions. There is evidence that the defendant also advised Dr. Parks to take x-rays of the plaintiff's neck; at his deposition for the instant action, however, Dr. Parks could not recall whether he took the x-rays at the defendant's direction. *See* Pl.Ex. F, at 56–58.

According to the record, on September 24, 1990, between approximately 10:10 a.m. and 3:32 p.m., Dr. Parks and Dr. Indelicato had 7 telephone conversations lasting a total of 38 minutes. Three of these telephone calls were made by Dr. Indelicato to Dr. Parks' office. *See* Pl.Ex. H. The plaintiff's condition was discussed during each of these calls. Dr. Parks, however, did not inform Dr. Indelicato of the plaintiff's full five-year medical history, did not identify her by name, and did not forward any records to Dr. Indelicato for his review. In addition, while Dr. Parks followed Dr. Indelicato's advice, he acknowledged that he was free to accept or reject the proffered advice. Although Dr. Parks called Dr. Monte B. Pellmar, a medical neurologist, at approximately 2:00 p.m., at no time prior to 2:00 p.m. did Dr. Indelicato advise Dr. Parks to seek emergent neurological care for the plaintiff.

The plaintiff remained at Dr. Parks' office until a friend arrived, at approximately 3:30 p.m., to drive her to the office of Dr. Pellmar, in Freehold, New Jersey. Although the plaintiff was aware that Dr. Parks had been on the telephone during her stay at his office, had described to another person her condition, and had provided short answers such as "yes," "no," and "okay," she had no knowledge of the identity of the person with whom Dr. Parks was speaking, and indeed had never met Dr. Indelicato prior to this incident. In the days that followed, Dr. Indelicato did not bill the plaintiff for his services, or attempt to communicate with her in connection with her condition.

The plaintiff subsequently was diagnosed as having suffered a stroke during the course of her stay at Dr. Parks' office. According to the plaintiff, her injuries, many of which are permanent, could have been mitigated had she received immediate medical or neurological attention at the nearest hospital.

## DISCUSSION

Under the law of the Second Circuit, a district court must weigh the following con-

siderations in evaluating whether to grant a motion for summary judgment with respect to a particular claim:

> First, summary judgment may not be granted unless "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c). Second, the burden is upon the moving party to demonstrate that no genuine issue respecting any material fact exists. In considering that, third, all ambiguities must be resolved and all inferences drawn in favor of the party against whom summary judgment is sought. Fourth, the moving party may obtain summary judgment by showing that little or no evidence may be found in support of the nonmoving party's case. When no rational jury could find in favor of the nonmoving party because the evidence to support its case is so slight, there is no genuine issue of material fact and a grant of summary judgment is proper.... Finally, the trial court's task at the summary judgment motion stage of the litigation is carefully limited to discerning whether there are any genuine issues of material fact to be tried, not to deciding them. Its duty, in short, is confined at this point to issue-finding, it does not extend to issue-resolution.

*Gallo v. Prudential Residential Servs., L.P.,* 22 F.3d 1219, 1223–24 (2d Cir.1994) (internal case citations omitted); *see also Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248, 106 S.Ct. 2505, 2510, 91 L.Ed.2d 202 (1986) ("Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment.").

The defendant moves for summary judgment dismissing the plaintiff's complaint in its entirety on the ground that a physician-patient relationship was never created between the parties. The plaintiff argues, meanwhile, that a physician-patient relationship may be implied under the circumstances presented, or alternatively, that the defendant may be held liable under principles of ordinary negligence for having voluntarily assumed a duty.[2] The Court now turns to address the merits of each of these contentions.[3]

## I. Medical Malpractice Claim

The defendant contends that summary judgment should be granted dismissing the plaintiff's complaint in its entirety because the record is devoid of evidence to show that a physician-patient relationship existed between the parties. The plaintiff, in turn, argues that the existence of a physician-patient relationship is a question of fact for the jury to decide, and contends that such may be found to exist under the circumstances of this case, in view of both the duration and the detail of the consultative communications that Dr. Indelicato made to Dr. Parks with respect to a specific person, and the foreseeability to Dr. Indelicato that Dr. Parks would follow his instructions.

"The requisite elements of proof in a medical malpractice action are (1) a deviation or departure from accepted [medical] practice, and (2) evidence that such departure was a proximate cause of injury or damage" to the plaintiff. *Bloom v. City of New York,* 202

---

**2.** In their arguments, both parties assume that the instant dispute is governed by New York law, perhaps because Dr. Indelicato, the defendant, rendered his medical advice with respect to the plaintiff from his New York office. Neither party contends that New Jersey law should govern this controversy on the ground that the plaintiff sustained her injuries in Dr. Parks' New Jersey office. The Court construes the parties' positions to constitute a stipulation that New York law governs the resolution of the instant motion for summary judgment.

**3.** The Court notes that the plaintiff's complaint also asserts a cause of action based on a lack of informed consent. The parties do not address this cause of action within their briefs. At oral argument, plaintiff's counsel stated that he would expect this claim to be withdrawn in the event that this case went to trial. In view of these circumstances, as well as the Court's determination in this Memorandum and Order that the plaintiff's complaint, in other respects, is able to withstand the defendant's motion for summary judgment, the Court declines to address *sua sponte* the viability of plaintiff's informed consent claim.

A.D.2d 465, 609 N.Y.S.2d 45, 45 (2d Dep't 1994) (internal quotes omitted).

Under New York law, "[a] medical malpractice case is distinguished from an ordinary negligence case by the fact that it involves a matter of science or art requiring special knowledge or skill not ordinarily possessed by the average person." 76 N.Y.Jur.2d: Malpractice § 71, at 82 (1989). "The more specialized theory of malpractice must be used where the medical treatment received is at issue, as the theory of simple negligence is restricted to those cases where the alleged negligent act can be readily determined by the trier of facts on the basis of common knowledge." *Id.* The New York Court of Appeals has observed that medical malpractice is simply a form of negligence and that no rigid analytical line separates the two; "[c]onduct may be deemed malpractice, rather than negligence, when it constitutes medical treatment or bears a substantial relationship to the rendition of medical treatment by a licensed physician." *Scott v. Uljanov,* 74 N.Y.2d 673, 674–75, 543 N.Y.S.2d 369, 370, 541 N.E.2d 398, 399 (1989) (internal quotes omitted).

■ Implicit in the notion that a medical malpractice action involves the rendition of medical services by a licensed physician is the requirement that a physician-patient relationship be in existence. Indeed, a medical malpractice action may not be maintained in the absence of a physician-patient relationship. *See McKinney v. Bellevue Hosp.,* 183 A.D.2d 563, 584 N.Y.S.2d 538, 539 (1st Dep't 1992); *Lee v. City of New York,* 162 A.D.2d 34, 560 N.Y.S.2d 700, 701 (2d Dep't 1990), *appeal denied,* 78 N.Y.2d 863, 578 N.Y.S.2d 878, 586 N.E.2d 61 (1991).

■ Surveying the case law in this area, the Court observes that a physician-patient relationship generally will not exist if the physician is retained solely to examine an employee on behalf an employer. *See Lee,* 560 N.Y.S.2d at 701 (citing *Murphy v. Blum,* 160 A.D.2d 914, 554 N.Y.S.2d 640 (2d Dep't 1990)). "An exception applies, however, when the physician affirmatively treats or affirmatively advises the employee as to treatment and the treatment actually causes further injury." *Id.* In such a case, a cause of action for medical malpractice may be maintained against the physician under an "implied contract" theory. *See id.; Hickey v. Travelers Ins. Co.,* 158 A.D.2d 112, 558 N.Y.S.2d 554, 555–56 (2d Dep't 1990); *LoDico v. Caputi,* 129 A.D.2d 361, 517 N.Y.S.2d 640, 641–42 (4th Dep't 1987), *appeal denied,* 71 N.Y.2d 804, 528 N.Y.S.2d 829, 524 N.E.2d 149 (1988); *see also Heller v. Peekskill Comm. Hosp.,* 198 A.D.2d 265, 603 N.Y.S.2d 548, 550 (2d Dep't 1993) (In the case of affirmative advice, it also must be shown that it was foreseeable to the physician that the plaintiff would rely upon such advice, and that the plaintiff did in fact rely upon the advice.); *Violandi v. City of New York,* 184 A.D.2d 364, 584 N.Y.S.2d 842, 843 (1st Dep't 1992) (A physician-patient relationship does not exist where the examination is conducted solely for the purpose or convenience or on behalf of the employer, even where the examination results in a misdiagnosis which is reported to the employer.).

■ The above line of cases is to be contrasted with the factual setting presented in *Ingber v. Kandler,* 128 A.D.2d 591, 513 N.Y.S.2d 11 (2d Dep't 1987), which stands for the proposition that a physician's *de minimis* consultative communication with a treating physician is insufficient to support a physician-patient relationship. In *Ingber,* the court affirmed the dismissal of a malpractice action against a physician who gave an informal opinion to a fellow physician regarding a patient with respect to which the defendant physician had no contact, saw no medical records, and did not know his name. *See id.* 513 N.Y.S.2d at 11. In view of the consultative physician's minimal contact with the treating physician and that physician's patient, *Ingber,* on the basis of its facts, stands at the far end of the spectrum in providing an example of circumstances that clearly will not give rise to a physician-patient relationship. Indeed, the circumstances in *Ingber* are vastly distinguishable from the case at bar, in view of the substantial consultative communications that are present in the instant case.

Looking beyond the boundaries of New York State to find cases more on point with

the facts of the case at bar, the Court observes that courts in other jurisdictions have limited to exceptional circumstances the instances in which a consultative physician's recommendation to other medical personnel will give rise to a physician-patient relationship.

In *Hill by Burston v. Kokosky,* 186 Mich. App. 300, 463 N.W.2d 265 (1990), *appeal denied,* slip op. (Sept. 24, 1991), the court addressed the issue of "whether a doctor who is contacted by a patient's treating physician to discuss treatment alternatives owes a duty of care to the patient whose case is discussed." *Id.* 463 N.W.2d at 266. In *Hill by Burston,* the plaintiff's treating obstetrician contacted two other doctors by telephone, on a single occasion, to obtain their opinions about the plaintiff's case based on the case history he reported. Both doctors related their opinions regarding treatment to the treating obstetrician. The telephoned physicians never contacted the plaintiff, examined her or reviewed her chart. The plaintiff subsequently brought suit against the consulted physicians. *See id.* The *Hill by Burston* court found the following factors to be persuasive in holding that a physician-patient relationship did not exist between the plaintiff and the defendant doctors: (1) neither defendant knew the plaintiff; (2) neither defendant examined the plaintiff; (3) neither defendant spoke with the plaintiff; (4) the plaintiff was not referred to the defendants for treatment or consultation; (5) the defendant's medical opinions were addressed directly to the plaintiff's treating physician as a colleague; and (6) the opinions were in a form of recommendation to be accepted or rejected by the plaintiff's treating physician as he saw fit. *See id.* at 267.

An important policy consideration to the *Hill by Burston* court was the free flow of information between professionals. The court equated the consulted doctors with source material such as a treatise or textbook and noted that they contributed to the body of information available to the treating physician as he treated his patient. *See id.* at 267–68. Consultations between professionals facilitate the free flow of information between colleagues and inure to the benefit of the professional and the patient. According to the court, to assess liability against "doctors with whom a treating physician has merely conferred, without more, would unacceptably inhibit the exchange of information and expertise among physicians." *Id.* at 268.

The reasoning employed by the *Hill by Burston* court was followed by the Texas Court of Appeals in *Lopez v. Aziz,* 852 S.W.2d 303 (Tex.Ct.App.1993). In *Lopez,* the plaintiff's physician, Dr. Martinez, consulted once by telephone with Dr. Aziz, an OB–GYN specialist, regarding his pregnant patient's condition. Dr. Martinez was the patient's primary physician and responsible for her care, but he sought and followed the advice of Dr. Aziz. *See id.* at 304. In concluding that no physician-patient relationship existed, the court noted that "Dr. Aziz did not contact, examine, or treat Mrs. Lopez, nor was Mrs. Lopez referred to him for any treatment or consultation. Dr. Aziz's opinions regarding the proper course of treatment were addressed to Dr. Martinez. Dr. Martinez, as Mrs. Lopez's treating physician, was free to accept or reject those opinions as he saw fit." *Id.* at 307.[4]

Other courts have found a physician-patient relationship to arise in a consultative setting, even though the physician and the patient have never met, where additional, overriding circumstances have been present. For instance, in *Walters v. Rinker,* 520 N.E.2d 468 (Ind.Ct.App.1988), plaintiff's treating physician contracted with a pathologist on behalf of his patient. The pathologist examined a sample of a tumor removed from the plaintiff's thigh and provided an erroneous opinion that the tumor was benign. *See id.* at 470. The physician's defense rested on

---

4. An additional factor considered by the *Lopez* court involved whether any contract existed between Dr. Martinez and Dr. Aziz for the benefit of the plaintiff. The *Lopez* court recognized that a physician-patient relationship may be established where others have contracted with the physician on the patient's behalf and for the patient's benefit. Dr. Aziz, however, never contracted with Dr. Martinez, or anyone else, to perform services for the plaintiff. Consequently, the court concluded that no physician-patient relationship came into existence on the basis of a third-party beneficiary theory. *See Lopez,* 852 S.W.2d at 306.

the absence of a physician-patient relationship because he had never examined, seen, treated or prescribed medication for the plaintiff. *See id.* at 471. The court rejected as too narrow the defendant's view of the relationship, stating that "*any* act performed by a health care provider as such" could fall within the purview of the Indiana medical malpractice statute at issue. *Id.* at 471 (emphasis in original). Aside from the fact that *Walters* presented a question of statutory construction, the result in *Walters* may be harmonized with prevailing doctrine under an implied contract theory, as the pathologist was a party to a contract for the rendition of medical services for which the plaintiff was a third-party beneficiary. *See id.* at 472.

In addition, in *Wheeler v. Yettie Kersting Memorial Hospital,* 866 S.W.2d 32 (Tex.Ct. App.1993), the plaintiff was an obstetrics patient who was brought to a hospital to determine whether she could be transferred to another, more distant medical facility to give birth. She was examined by two nurses. One of the nurses discussed the plaintiff's status with an on-call physician who had staff privileges at the hospital, during a single telephone call. *See id.* at 35. The physician had no contact or connection with the plaintiff, who was completely unaware that the nurse had telephoned the physician. The on-call physician evaluated the information communicated to him and made a medical decision whether the plaintiff could be transported. *See id.* at 39. Noting the "unique circumstances presented in a transfer situation," *id.* at 40 n. 6, the *Wheeler* court found that the on-call physician actually rendered services to the plaintiff, thereby establishing a physician-patient relationship. *See id.* at 39–40; *cf. Cintron v. New York Medical College Flower and Fifth Ave. Hosps.,* 193 A.D.2d 551, 597 N.Y.S.2d 705, 705 (1st Dep't 1993) (Observing that in those cases, under New York law, where a physician-patient relationship has been found to exist between an "on-call" attending physician and a patient, treatment was either required by hospital rules, or in fact was undertaken by the physician; no such relationship is established where "the rules and custom of the particular hospital required only that the 'on-call' physician consult with the attending physicians.").

■ The foregoing cases may be read to suggest that the determination of whether a physician-patient relationship has been established, as a result of a consultation between physicians, should not necessarily hinge upon whether a contractual obligation may be implied, under third-party beneficiary principles, between the consultative physician and the treating physician's patient. *Cf. Wheeler,* 866 S.W.2d at 39 (focusing instead upon whether actual medical services were rendered by the consultative physician). Indeed, although it may provide a useful starting point for the analysis, an examination of a physician-patient relationship solely through the lens of contract-law principles overlooks the conceptual distinction between contractual obligations, on the one hand, and the tort concept of duty, on the other. Rather, it appears to the Court that the better approach eschews a bright-line rule in favor of a qualitative analysis of the consultative physician's actions in relation to the plaintiff, that considers, among other things, the extent to which the consultative physician has exercised independent professional judgment. *Cf. Hill by Burston,* 463 N.W.2d at 267 (addressing several relevant considerations arising out of the circumstances of that case).

■ In the instant case, the Court regards the following circumstances to be highly probative in its evaluation of whether a physician-patient relationship came into existence: (1) the extent to which Dr. Indelicato, the consultative physician, exercised his professional judgment in a matter bearing directly upon the plaintiff, and (2) the foreseeability to Dr. Indelicato that his exercise of judgment ultimately would determine the precise nature of the medical services to be rendered to the plaintiff. Where the consultative physician is merely advising another physician how to proceed with respect to a patient whose identity is unknown to him, and the treating physician exercises his or her own independent judgment in determining whether to accept or reject such advice, it stands to reason that the consultative physician should not be regarded as a joint provider of medical services with respect to the patient. Con-

sequently, in such circumstances, the consultative physician should not be regarded as a party to a physician-patient relationship.

 The Court, however, regards the facts of the instant case to present extraordinary circumstances in view of the actual direction that Dr. Indelicato provided to Dr. Parks, over a substantial period of time, with respect to Dr. Parks' treatment of Ms. Gilinsky. Although there is no evidence to suggest that neither Dr. Indelicato nor the plaintiff knew each other, or had previously contemplated a physician-patient relationship prior to Dr. Parks' call for assistance, the nature of the consultation between the physicians was not fleeting and informal, as in *Ingber*, 513 N.Y.S.2d at 11, but rather was continuous, and substantial, spanning some seven telephone calls that lasted, in the aggregate, approximately 38 minutes. Three of these telephone calls, in fact, were placed by Dr. Indelicato. Considering these circumstances in tandem with Dr. Indelicato's mentor relationship with Dr. Parks, a reasonable jury could find that it should have been foreseeable to Dr. Indelicato, under the emergent circumstances presented, that Dr. Parks would rely upon Dr. Indelicato's advice, and perform the exact procedures that Dr. Indelicato instructed.

The Court pauses to comment before proceeding further with its analysis. As the Court does not wish its decision to be construed to hamper the free flow of information between medical professionals, the Court expressly holds that it does not regard the foreseeability to Dr. Indelicato that Dr. Parks would rely upon his advice, standing by itself, to be sufficient to establish a physician-patient relationship between Dr. Indelicato and the plaintiff. Rather, in the Court's view, actual direction of the treating physician is required. In the context of this case, in order for Dr. Indelicato to have become a party to a physician-patient relationship with Ms. Gilinsky, the plaintiff also must prove at trial that Dr. Parks actually subordinated his independent professional judgment to Dr. Indelicato, and that this subordination of judgment was reasonably foreseeable to Dr. Indelicato. Assuming that this were the case, then Dr. Indelicato properly could be regard-

ed as the principal provider of medical treatment to the plaintiff, with Dr. Parks functioning as his agent.

In view of the extraordinary circumstances presented, the Court concludes that a reasonable jury could find that, in treating the plaintiff, Dr. Parks functioned as an agent of Dr. Indelicato, with Dr. Indelicato serving as the ultimate decisionmaker concerning the nature of the procedures performed upon the plaintiff. This determination is supported by the record, which shows that at the time of the incident, Dr. Parks was enrolled in a chiropractic neurology residency, and believed himself to be lacking in experience in the diagnosis and treatment of the neurological symptoms manifested by the plaintiff. Otherwise stated, in speaking with Dr. Indelicato, there may have come a point in time at which Dr. Parks ceased to seek consultative advice, but rather sought actual direction. Further, a reasonable jury could find from the evidence that Dr. Parks' request for direction, and attendant subordination of his independent professional judgment, should have been apparent to Dr. Indelicato. While it is noteworthy that not all of Ms. Gilinsky's circumstances, including her medical history, may have been explained to Dr. Indelicato, this does not detract from the inference that Dr. Indelicato nonetheless exercised his professional judgment while Dr. Parks served as his physical extension.

 Finally, the Court notes that Ms. Gilinsky's absence of knowledge concerning Dr. Indelicato's identity, or that another physician was directing her medical treatment, is not fatal to the existence of a physician-patient relationship for purposes of this motion for summary judgment, because where an emergency situation is presented, the law often will imply the patient's consent to the medical treatment of a physician with whom she has not contracted for medical services. *Cf.* N.Y.Pub.Health Law § 2805–d (McKinney 1993) (providing a defense to a medical malpractice action based on a lack of informed consent where the procuring of the patient's consent was not reasonably possible).

In sum, therefore, the Court concludes that, viewing the evidence in the light most

favorable to the plaintiff, a reasonable jury could find from the nature of the relationship between Dr. Indelicato and Dr. Parks, and the frequency and duration of their communications, that Dr. Indelicato's instructions concerning the plaintiff transcended mere advice, and in fact reached the level of actual direction. Accordingly, a reasonable jury could find that the factual underpinnings to a physician-patient relationship existed between Dr. Indelicato and Ms. Gilinsky, thereby supporting a medical malpractice action. For this reason, the defendant's motion for summary judgment is denied.

## II. Ordinary Negligence Claim

The parties also dispute whether the plaintiff states a claim of ordinary negligence against the defendant resulting from Dr. Indelicato's voluntary assumption of a duty.

■ "The distinction between ordinary negligence and malpractice turns on whether the acts or omissions complained of involve a matter of medical science or art requiring special skills not ordinarily possessed by lay persons or whether the conduct complained of can instead be assessed on the basis of the common everyday experience of the trier of the facts." *Miller v. Albany Medical Center Hosp.*, 95 A.D.2d 977, 464 N.Y.S.2d 297, 298–99 (3d Dep't 1983) (citations omitted). In addition, "when a risk of harm has been identified through the exercise of medical judgment, a failure to follow through by taking measures to prevent the harm may constitute actionable ordinary negligence." *Id.* 464 N.Y.S.2d at 299 (citations omitted); *see Papa v. Brunswick Gen. Hosp.*, 132 A.D.2d 601, 517 N.Y.S.2d 762, 763–64 (2d Dep't 1987). Thus, the plaintiff's claim may be analyzed under principles of ordinary negligence if the jury is able to evaluate the reasonableness of Dr. Indelicato's conduct on the basis of their common, everyday experiences. *See, e.g., Smith v. Pasquarella*, 201 A.D.2d 782, 607 N.Y.S.2d 489, 490–91 (3d Dep't 1994) (Where a physician examined a plaintiff on behalf of an insurance carrier and the plaintiff thereafter claimed that the phy-

sician acted in a negligent manner and aggravated an existing injury, the plaintiff alleged negligence, rather than medical malpractice, where she alleged that the defendant physician removed her crutches from her reach so that she had to hop across the floor to retrieve them.); *McKinney v. Bellevue Hosp.*, 183 A.D.2d 563, 584 N.Y.S.2d 538, 540 (1st Dep't 1992) ("The failure to inform an employee or prospective employee that his pre-employment physical has detected a serious medical condition is an act of ordinary negligence within the experience of a trier of fact."). Unlike a medical malpractice claim, the theory of simple negligence does not require the existence of a physician-patient relationship. *See McKinney*, 584 N.Y.S.2d at 539; *Borrillo v. Beekman Downtown Hosp.*, 146 A.D.2d 734, 537 N.Y.S.2d 219, 220 (2d Dep't 1989).

■ In the instant case, the plaintiff has introduced evidence to show that, during a five-hour period on September 24, 1990, Dr. Parks and the defendant, Dr. Indelicato, spoke on seven different occasions concerning the physical symptoms of a specific patient, who ostensibly was in need of emergent medical treatment. For the reasons previously stated in this Memorandum and Order, viewing the evidence in the light most favorable to the plaintiff, a reasonable jury could find that Dr. Indelicato's comments crossed the boundary that divides mere advice from actual direction. By so doing, or otherwise stated, by attempting to "rescue" the plaintiff, Dr. Indelicato acted in a manner that subjected the plaintiff to a foreseeable risk of harm. Even without the aid of expert testimony, a reasonable jury, drawing upon their common, everyday experiences, could conclude that the defendant, by attempting to diagnose and direct the treatment of the plaintiff over the telephone, failed to act as a reasonably prudent person under like circumstances, and that such conduct was a substantial contributing factor in bringing about the plaintiff's injuries. Accordingly, the defendant's motion for summary judgment is denied on this ground as well.[5]

---

5. The Court notes that, insofar as the claims of medical malpractice and ordinary negligence would compensate the plaintiff for the same inju-

ry, only a single damage award would be recoverable at trial on these causes of action. The Court further notes that it is unnecessary to

## CONCLUSION

For the foregoing reasons, the defendant's motion for summary judgment is DENIED in its entirety.

SO ORDERED.

determine at this time whether this action is more appropriately considered a medical malpractice action, as opposed to an ordinary negligence action, because the defendant does not assert the statute of limitations as an affirmative defense. *Cf. Scott v. Uljanov,* 74 N.Y.2d 673, 674, 543 N.Y.S.2d 369, 370, 541 N.E.2d 398, 399 (1989) (noting that different limitation periods apply to medical malpractice and ordinary negligence actions, even though medical malpractice is simply a form of negligence).