**Lawrence LANGMAN and Janice Langman, Appellants–Plaintiffs,**

v.

**Peter MILOS, D.P.M. and Dennis W. Smith, D.P.M., Appellees–Defendants.**

No. 64A03–0109–CV–312.

Court of Appeals of Indiana.

March 28, 2002.

Thomas F. Macke, Blachly, Tabor, Bozik & Hartman, Valparaiso, IN, Attorney for Appellants.

John M. McCrum, Eichhorn & Eichhorn, Hammond, IN, Attorney for Dennis W. Smith, D.P.M.

David M. McTigue, Herendeen Kowals Ambler McTigue & Lenyo, South Bend, IN, Attorney for Peter Milos, D.P.M.

Peter H. Pogue, Jon M. Pinnick, Donald B. Kite, Sr., Schultz & Pogue, LLP, Carmel, IN, James D. Johnson, Rudolph Fine Porter & Johnson LLP, Evansville, IN, Attorneys for Amicus Curiae Defense Trial Counsel of Indiana.

## OPINION

MATHIAS, Judge.

Lawrence and Janice Langman ("the Langmans") appeal the Porter Superior Court's order granting the Motion for Summary Judgment filed by Drs. Peter Milos, D.P.M. and Dennis W. Smith, D.P.M. ("the Defendants").[1] The one dispositive issue in the Langmans' appeal is: Whether the trial court erred when it found that there were no genuine issues of material fact regarding whether the Langmans filed their complaint within the applicable two-year statute of limitations.[2]

We affirm.

### Facts and Procedural History

The facts most favorable to the trial court's judgment reveal that on February 7, 1993, Lawrence Langman ("Lawrence") was injured at his place of employment, the Bethlehem Steel Plant in Burns Harbor, Indiana, when a large piece of steel (approximately 800 pounds) struck his left leg and foot. He was immediately taken to Porter Memorial Hospital, where his wound was cleansed and sutured. A few days later, Lawrence met with Dr. Babcoke, who ordered Lawrence to physical therapy. Weeks later, on April 23, 1993, Dr. Babcoke referred Lawrence to Dr. Joseph B. Koscielniak, Jr., M.D. ("Dr. Koscielniak"), an orthopedic surgeon in Merrillville, Indiana.

After examining Lawrence, Dr. Koscielniak believed that Lawrence's symptoms indicated Reflex Sympathetic Dystrophy ("RSD").[3] Appellant's App. p. 465. Dr. Koscielniak recommended that Lawrence seek further treatment, such as a

---

1. The Langmans' Petition for Oral Argument is denied.

2. The Langmans also argue that the trial court committed reversible error by failing to specifically rule on the Defendants' motion to strike a medical journal article from the Langmans' designated evidence attached to their response to the Defendants' motion for summary judgment. Because we conclude that the trial court correctly granted the Defendants' motion for summary judgment based upon the fact that the Langmans' failed to file their complaint within the applicable two-year statute of limitations, we need not address this argument.

3. RSD is defined as "[a] syndrome of pain and tenderness, usually to a hand or foot, associated with vasomotor instability, skin changes and rapid development of bony demineralization (osteoporosis). Frequently will follow a localized trauma, stroke or peripheral nerve injury." The On–Line Medical Dictionary, *available at* http://www. graylab.ac. uk/omd/index. html (last visited March 6, 2002).

sympathetic block.[4] Dr. Koscielniak referred Lawrence to Dr. Sheila Stinson ("Dr. Stinson"), also in Merrillville, Indiana. Dr. Stinson was an anesthesiologist who ran a pain clinic. *Id.* at 466. On May 8, 1993, Dr. Koscielniak noted that Lawrence had seen Dr. Stinson for pain control, and that he had little success with outpatient epidurals. *Id.* at 467. Lawrence was admitted to the hospital that same day, and underwent an insertion of an epidural catheter. After insertion, he reported a pain level of zero, but his mobility had also decreased. Lawrence then began physical therapy, at which point he noticed increased pain. Lawrence was given Valium, and he reported a decrease in pain. Lawrence was discharged three days later. *Id.* at 470.

Also during the summer of 1993, Lawrence met with Dr. Jonathon R. Javors ("Dr. Javors") several times. On June 4, 1993, Dr. Javors told Lawrence that it was unclear whether Lawrence had RSD because Lawrence was not exhibiting the common symptoms of the disease, such as hypersensitivity, hair loss, hyperhidrosis, sweating, shiny skin, and loss of motion. *Id.* at 535. To properly diagnose Lawrence, Dr. Javors ordered a bone scan, an electromyography ("EMG"), and a magnetic resonance imaging ("MRI") of Lawrence's foot. After receiving the results of the diagnostic tests, Dr. Javors concluded on June 11, 1993, that Lawrence did in fact suffer from RSD. *Id.* at 481. Dr. Javors stated, "With the amount of sensitivity he's got I am just afraid that any kind of surgery at this time is going to make it worse and we need to try and get this settled down more before we do any kind of surgery." *Id.*

In a letter dated September 1, 1993, Dr. Javors gave Lawrence a Permanent Partial Impairment rating for purposes of worker's compensation. Then in a letter dated October 11, 1993, Dr. Javors stated that Lawrence should be permanently restricted from climbing ladders, walking on uneven ground, and walking on beams. He also stated that Lawrence should not be on his feet for an entire eight-hour day without resting every few hours. *Id.* at 495–97. Lawrence settled his worker's compensation claim in November of 1993, and that was the last time he visited Dr. Javors. Lawrence continued to work on a full-time basis, did not undergo any further physical therapy, and did not visit another doctor for his foot and ankle for almost one year, when he met with Dr. Peter Milos ("Dr. Milos"), a podiatrist, in October of 1994. *Id.* at 109–10.

In his records, Dr. Milos noted that at their first meeting on October 1, 1994, Lawrence complained of severe pain in his left foot. Janice Langman ("Janice") said that Lawrence informed Dr. Milos of the RSD diagnosis. *Id.* at 112. Dr. Milos gave Lawrence a prescription for his pain and two days later, he referred Lawrence to have an EMG. On October 8, 1994, Dr. Milos performed laboratory work and an arthritis profile, and also prescribed more pain medication for Lawrence, which was consistent therapy throughout the doctor-patient relationship. On November 19, 1994, Dr. Milos decided that Lawrence needed surgery to remove a talo-calcaneal bridge on his left foot.[5] *Id.* at 573.

---

**4.** A sympathetic block is performed to determine if there is damage to the sympathetic nerve chain and if the damage is the source of pain. A block is primarily a diagnostic test. International Spinal Injection Society website, *available at* http://www. spinalinjection.com/isis1/pes/ symp.htm (last visited March 1, 2002).

**5.** A talo-calcaneal coalition is a fusion of the talus bone to the calcaneus bone. Temple University School of Podiatric Medicine web-

Dr. Milos referred Lawrence to Dr. Dennis W. Smith ("Dr. Smith") for surgery. Dr. Smith's preoperative diagnosis was that Lawrence suffered from a talo-calcaneal bar and calcaneal navicular bar, both on the left foot.[6] On December 28, 1994, Dr. Smith performed surgery on Lawrence. During surgery, Dr. Smith removed both of the diagnosed bone coalitions. *Id.* at 588–89. Dr. Milos maintained contact with Lawrence following the surgery. Two days after surgery, December 31, 1994, Dr. Milos met with the Langmans and reported, "[p]atients [sic] wife relates patient not wearing surgical boot as directed." *Id.* at 574.

Dr. Milos' reports show that during his post-operative visits, Lawrence's wound dressings were changed, he had x-rays, injections, Accu–Scope® therapy, and he received several prescriptions for pain relievers. The reports also show that Lawrence increased his activity against Dr. Milos' orders within the first week after the surgery, and that on January 14, 1995, Dr. Milos informed Lawrence that he should not have returned to work on January 9, 1995 (about twelve days after surgery). Dr. Milos instructed Lawrence to reduce his activity and to wear his surgical boot. *Id.* at 575–78. Until March of 1995, Dr. Milos' notes state only that Lawrence was healing well with continuous improvement.

On March 4, 1995, though, Lawrence reported to Dr. Milos that he felt pain in his left foot, in several different locations. Lawrence told Dr. Milos that a cat had jumped on his left ankle, which caused swelling. He also reported pain after long periods of standing, and Dr. Milos reported slight edema (swelling) near the surgical incision on the left foot. *Id.* at 578. Janice testified that within a few months of the surgery, Lawrence's condition had grown worse and had spread from Lawrence's left foot and ankle up to his left knee. *Id.* at 124.

From March through early August of 1995, Lawrence underwent injection therapy, received at least three references from Dr. Milos to other doctors who could provide Lawrence with further evaluations, and received prescriptions for pain medicine approximately every seven to ten days. One doctor to whom Lawrence was referred was Dr. James W. Kozelka ("Dr. Kozelka"), from Neurological Associates in Valparaiso.

Dr. Kozelka wrote a letter to Dr. Milos, dated July 25, 1995, in which he described his knowledge of Lawrence's medical history with regard to his left foot and ankle, and stated that Lawrence complained mostly of pain in his left foot and ankle, but occasional pain radiating up to his left knee. After explaining the findings of his exam that showed no real attributes of RSD in Lawrence, he wrote:

> In summary, Mr. Langman is a 33–year–old gentleman with chronic pain dating to a work related accident who has been given a diagnosis of reflex sympathetic dystrophy. Physical exam is essentially negative with no evidence [of] changes in the skin, hair or nails. I doubt the diagnosis, but have suggested evaluation to include an EMG/SSEP of the legs, and a bone scan.

---

site, *available at* http://podiatry.temple.edu/clinic/ coalition.htm (last visited March 4, 2002).

**6.** The calcaneal navicular bar is the most common bone coalition in the foot, and com-

bines the calcaneus and navicular bones. The talo-calcaneal coalition is the second most common bone coalition. Medical Information website, *available at* http:// www.drjcgraham. com/medd_article_ 0200.htm (last visited March 5, 2002).

*Id.* at 592–93. Janice testified that she did not remember Dr. Kozelka discussing RSD with them, but was sure that he was aware of the diagnosis because Lawrence "usually told [the doctors] everything." *Id.* at 126. She also testified that Dr. Kozelka ordered Lawrence to undergo some diagnostic testing.

Against his wife's wishes, Lawrence did not follow up with treatment or diagnostic tests with Dr. Kozelka, and Dr. Milos' last encounter with Lawrence was when the office phoned in a prescription for pain relievers for Lawrence on August 7, 1995. Although Lawrence made numerous visits to the emergency room after he was no longer under Dr. Milos' care (for such things as an eye injury, bronchitis, pneumonia), he never visited the hospital for foot, ankle, or leg pain.

Janice testified that after the initial visit with Dr. Kozelka in July of 1995, Lawrence refused to visit any more doctors with regard to his left foot and ankle because "he was tired of seeing doctors. Nobody was able to help him yet, and the last doctor he went to, it got worse." *Id.* at 130. Lawrence testified that he told Dr. Milos that he believed the operation, recommended by Dr. Milos and performed by Dr. Smith, had made his condition worse. He also testified that part of the reason he stopped seeing Dr. Milos was because Dr. Milos "seemed like he didn't want to give me anything else for the pain anymore, and he told me that he was going to get in trouble for giving me more pain med." *Id.* at 76–77. After August of 1995, Lawrence continued to work on a full-time basis.

Lawrence's next visit to a doctor for symptoms of his left foot, ankle and leg was two years and seven months later, in February of 1998, when he met with Dr. Frederick N. Fedorchak ("Dr. Fedorchak"), a podiatrist in Portage, Indiana. Janice testified that approximately six months prior to visiting Dr. Fedorchak, Lawrence's RSD symptoms had slowly started to spread from his left leg to his right leg. Additionally, Dr. Fedorchak reported that Lawrence informed him that at some point prior to the visit, his pain had spread to his left groin area. Dr. Fedorchak told Lawrence that the surgery, recommended by Dr. Milos and performed by Dr. Smith, "shouldn't have been done." *Id.* at 78, 692–93. Dr. Fedorchak immediately referred Lawrence to Dr. Terri Dallas–Prunskis ("Dr. Dallas–Prunskis"), at the Illinois Pain Treatment Institute, and called her office to make an appointment while Lawrence was there that same day.

Dr. Dallas–Prunskis' notes from her first meeting with Lawrence on February 12, 1998, state that Lawrence was not properly treated for his RSD and that the RSD became uncontrolled as he attempted to continue physical therapy. She stated that Lawrence sought help from Dr. Milos, who "performed surgery on the foot which caused a more intense pain." *Id.* at 787. Dr. Dallas–Prunskis outlined her proposed treatment plan for Lawrence, which included physical therapy, pharmaceutical therapy, and intravenous injections. Dr. Dallas–Prunskis' notes on Lawrence end in August of 1999. Throughout the records, Lawrence underwent numerous treatments, including having a pump placed into his abdomen so that he could have a continuous flow of pain medications into his body. By August 31, 1999, the last entry by Dr. Dallas–Prunskis on Lawrence, she stated that Lawrence complained of pain all over his body, a burning sensation in his face, headaches, sharp pain, swollen hands at times, nails that break easily, and constipation. Janice told Dr. Dallas–Prunskis that Lawrence hardly ate one meal per day. *Id.* at 830.

On October 6, 1999, more than four years after Lawrence's last contact with

Dr. Milos and more than four and a half years after Dr. Smith performed surgery on Lawrence's foot, the Langmans filed a Proposed Complaint with the Indiana Department of Insurance, alleging that Drs. Milos and Smith negligently performed surgery on him, causing his pain to increase and his RSD to advance. The Langmans also alleged that Lawrence continues to suffer from "great pain and severe and permanent irreversible injuries[,]" lost income, continued health care expenses, and that Janice has lost the love, affection, consortium, enjoyment and companionship of Lawrence. *Id.* at 144.

On June 23, 2000, the Defendants deposed Lawrence and Janice Langman, and on November 28, 2000, the Defendants filed a Joint Motion for Summary Judgment, including designated evidence and memorandum, with the Porter Superior Court. The Defendants' summary judgment motion alleged that the Langmans' negligence suit was barred by the two-year medical malpractice statute of limitations.

On December 21, 2000, the Langmans filed a Response to the Defendants' Motion for Summary Judgment, and also designated supporting evidence. The Langmans' designated evidence included medical records, depositions, and an article from a medical journal. On January 25, 2001, the Defendants filed a Motion to Strike the article from the Langmans' designated evidence and all references to the article contained in the Langmans' response.

On February 2, 2001, the Langmans filed a response to Defendant's Motion to Strike the article, arguing that because the article is from a learned treatise, it falls under an exception to the hearsay rule and is admissible evidence. The Porter Superior Court issued an Order on August 14, 2001, granting the Defendants' Joint Mo-

tion for Summary Judgment, and not specifically ruling on the Motion to Strike.[7] The trial court found that it would be unreasonable to assume that the Langmans were not aware of the underlying disease, the changes in Lawrence's condition, and other things that would have provided them with adequate notice of his potential claim of malpractice. *Id.* at 847. The trial court also found that there was never a change in the severity of the RSD diagnosis throughout the applicable period that indicated the effects of the surgery on the progression of Lawrence's RSD. The Langmans now appeal. Additional facts will be provided as necessary.

## Standard of Review

■ Summary judgment is a procedural means to halt litigation when there are no factual disputes and to allow the case to be determined as a matter of law. *LeBrun v. Conner,* 702 N.E.2d 754, 756 (Ind.Ct.App. 1998). Under Indiana Trial Rule 56, the moving party bears the burden of showing that there are no genuine issues of material fact. If the moving party meets its burden, the burden shifts to the non-moving party to set forth facts showing the existence of a genuine issue for trial. Ind. Trial Rule 56(C), 56(E); *Oelling v. Rao,* 593 N.E.2d 189, 190 (Ind.1992).

■ Summary judgment is appropriate only if there is no evidence of a genuine issue of material fact for trial and the moving party is entitled to judgment as a matter of law. *Aide v. Chrysler Fin. Corp.,* 699 N.E.2d 1177, 1180 (Ind.Ct.App. 1998), *trans. denied.* However, summary judgment is inappropriate if any material facts are in dispute or even if undisputed facts could "lead to conflicting material

---

7. The Chronological Case Summary shows that a hearing was scheduled for March 6, 2001. We have no record of whether this hearing took place.

inferences." *Butler v. City of Indianapolis*, 668 N.E.2d 1227, 1228 (Ind.1996).

■ If the moving party asserts the statute of limitations as an affirmative defense and establishes that the action was commenced outside of the statutory period, the non-moving party then has the burden of establishing an issue of fact material to a theory that avoids the affirmative defense. *Boggs v. Tri–State Radiology, Inc.*, 730 N.E.2d 692, 695 (Ind. 2000) (citing *Conard v. Waugh*, 474 N.E.2d 130, 134–35 (Ind.Ct.App.1985)).

## Discussion and Decision

The Langmans argue that the trial court erred when it granted the Defendants' Motion for Summary Judgment because the Defendants failed to meet their burden of proving that the Langmans' medical malpractice claim (filed October 6, 1999) was barred by the statute of limitations. The Langmans argue that because they did not learn of the possibility of the Defendants' alleged malpractice until February 2, 1998, when they met with Dr. Fedorchak, they had two years thereafter to file their complaint (until February 2, 2000).

The statute of limitations for medical malpractice claims is found at Indiana Code section 34–18–7–1(b):

(b) A claim, whether in contract or tort, may not be brought against a health care provider based upon professional services or health care that was provided or that should have been provided unless the claim is filed within two (2) years after the date of the alleged act, omission, or neglect, except that a minor less than six (6) years of age has until the minor's eighth birthday to file.

Ind.Code § 34–18–7–1(b) (1998). This occurrence-based statute of limitations has been upheld as constitutional on its face under the Indiana Constitution, Article I, Sections 12 and 23, but has also been held to be unconstitutional as applied in certain circumstances. *Van Dusen v. Stotts*, 712 N.E.2d 491, 493 (Ind.1999); *Martin v. Richey*, 711 N.E.2d 1273, 1284–85 (Ind. 1999). The statute requires the filing of a medical malpractice action within two years of the alleged negligent act and has been upheld as constitutional when applied to all plaintiffs able to discover the alleged malpractice and injury within two years from the occurrence. *See Martin*, 711 N.E.2d at 1278.

■ Approximately three months after the trial court ordered summary judgment, our court handed down two companion cases outlining the law in this area. In *Rogers v. Mendel*, 758 N.E.2d 946 (Ind.Ct. App.2001), and *Shah v. Harris*, 758 N.E.2d 953 (Ind.Ct.App.2001), two panels of our court held that our supreme court's decisions in *Martin, Van Dusen,* and *Boggs* together create a two-stage analysis for the application of Indiana's two-year medical malpractice limitation period. The first stage of the analysis begins with determining whether a claimant discovered the alleged malpractice and resulting injury, or possessed information that would have led a reasonably diligent person to such discovery during the two-year period after the alleged act or omission. If the answer is affirmative, then the purely occurrence-based limitation period is both applicable and constitutional, so long as the claim can reasonably be asserted before the period expires. *Boggs*, 730 N.E.2d at 697–98; *Van Dusen*, 712 N.E.2d at 497–98; *Martin*, 711 N.E.2d at 1279–80; *Rogers*, 758 N.E.2d at 951; *Shah*, 758 N.E.2d at 958.

■ If, however, a claimant does not discover the alleged malpractice and resulting injury, and does not possess information that would lead a reasonably diligent person to such discovery during the

two-year period, then the purely occurrence-based limitation period is unconstitutional as applied. *Van Dusen,* 712 N.E.2d at 497–98; *Martin,* 711 N.E.2d at 1279–80; *Rogers,* 758 N.E.2d at 951–52; *Shah,* 758 N.E.2d at 958–59. A second stage of analysis must then be applied to determine when the claimant possessed enough information that, in the exercise of reasonable diligence, should have led to the discovery of the alleged malpractice and resulting injury. The date determined is the date the two-year limitations period begins to run for such a claimant. *Van Dusen,* 712 N.E.2d at 497–98; *Martin,* 711 N.E.2d at 1279–80; *Rogers,* 758 N.E.2d at 952; *Shah,* 758 N.E.2d at 959.

■ Whether Indiana Code section 34–18–7–1 is constitutional as applied is a question of law to be determined by the trial court on a case-by-case basis. In some instances, this question will be subject to resolution on the basis of undisputed facts, as in the case before us. In other instances, the judge will be required to resolve disputed facts through pre-trial motion practice in order to determine the date upon which the claimant possessed enough information that, in the exercise of reasonable diligence, should have led to the discovery of the alleged malpractice and resulting injury.

In the case before us, the trial court granted the Defendants' motion for summary judgment. The trial court found that Langman knew or should have known of a possible malpractice claim within two years of the alleged occurrence. Appellant's App. p. 847. The trial court also held that Lawrence's medical condition was not analogous to a long-term latency disease such that Lawrence did not and could not discover the alleged malpractice with reasonable diligence within the two-year statute of limitations because of the type of disease. *Id.* at 848.

We agree with the trial court and resolve this appeal under the analysis set forth in *Rogers* and *Shah.* This case does not pass the first stage of that analysis. It is undisputed that on February 7, 1993, Lawrence was injured when a large steel beam fell on his leg and foot at work. Lawrence sought treatment that same day for his injuries. His pain was consistent, and he was first diagnosed with RSD on June 11, 1993, four months after his initial injury. Lawrence consistently sought various treatments from various doctors. Throughout the pertinent time period, Lawrence continued to work full-time, even though sometimes against his doctors' orders. Lawrence's referrals and treatment led him to Dr. Milos in October of 1994.

Dr. Milos started treating Lawrence with physical and pharmaceutical therapy, just as the previous doctors had done, but then decided that because conservative treatment methods had not worked in the last year and ten months since the injury, surgery was the next option for Lawrence. Dr. Milos arranged to have Dr. Smith perform surgery on Lawrence to remove bone coalitions in his left foot. Dr. Smith performed surgery on December 28, 1994. Lawrence's condition was not cured, but rather, within a few months of the surgery, he complained that his condition had worsened, with his pain moving up from his left foot and ankle to his left knee. *Id.* at 130.

In July of 1995, Lawrence met with Dr. Kozelka for further pain treatment, but Lawrence refused to follow any advice at that time. Lawrence treated with Dr. Milos from the time of their initial appointment on October 1, 1994, until August of 1995. Thereafter, although Lawrence's worsened and worsening symptoms would have led a reasonably diligent person to discover the alleged malpractice and resulting injury, he did not seek medical

assistance for anything related to his left foot, ankle or leg until February 2, 1998, nearly two and one-half years after his last visit with Dr. Milos.

■ It is clear from the undisputed facts that Lawrence and Janice were aware within several months after his December 1994 surgery, that Lawrence's pain had increased and spread. Lawrence continued to treat with Dr. Milos until August of 1995, complaining of increased pain from about March of 1995. After August of 1995, Lawrence ceased visiting doctors, not because Lawrence was feeling better, but because Lawrence was fed up with every prior doctor's inability to make him feel better, and because he was upset that the surgery had made him feel worse. Here, Lawrence admits that he felt worse within several months after the surgery, and even told Dr. Milos that the surgery caused the increased pain. *See* Appellant's App. pp. 76–77, 130. Within two years of his surgery, and clearly within two years of his last visit to Dr. Milos, Lawrence and Janice had enough information that a rea-sonably diligent person should have discovered the alleged malpractice claim against Drs. Milos and Smith.

## Conclusion

Because there are no genuine issues of material fact and the undisputed facts clearly show that the Langmans' possessed knowledge that would have led a reasonable person to discover the alleged malpractice and resulting injury well within the applicable two-year statute of limitations, the trial court did not err when it granted the Defendants' motion for summary judgment based on bar by the statute of limitations.

Affirmed.

BROOK, C.J., and RILEY, J., concur.