**Real and Lise GARNEAU, Appellants,**

v.

**Charles E. BUSH, Jr., M.D., Appellee.**

**No. 12A02–0502–CV–138.**

Court of Appeals of Indiana.

Dec. 13, 2005.

1136

Rex E. Baker, Caroline A. GiLchrist, Baker & Gilchrist, Avon, for Appellants.

Robert G. Zeigler, Bobby J. Avery–Seagrave, Zeigler Cohen & Koch, Indianapolis, for Appellee.

## OPINION

MATHIAS, Judge.

Real and Lise Garneau ("the Garneaus") appeal from the Carroll Circuit Court's grant of summary judgment in favor of Charles E. Bush, Jr., M.D. ("Dr. Bush") on their claim for medical malpractice. They raise the following issue: whether the trial court erred when it found the Garneaus' claim was barred by the statute of limitations. Concluding that the trial court improperly granted summary judgment in favor of Dr. Bush, we reverse and remand for proceedings consistent with this opinion.

### Facts and Procedural History [1]

On March 16, 1998, Lise Garneau ("Lise") fell and suffered a subcapital fracture of her left hip. She was taken by ambulance to Clinton County Hospital where she was admitted under the care of Dr. Bush, who had previously treated her for other injuries. Lise also suffered from several ongoing health conditions, including Type II diabetes, hypertension, and multiple sclerosis.

Dr. Bush told the Garneaus that Lise needed hip replacement surgery. On March 17, 1998, Dr. Bush performed the surgery and placed a 44–millimeter Austin–Moore prosthesis in Lise's left hip. Lise was later admitted to Rehabilitation Hospital of Indiana, and was discharged from its rehabilitation program on April 11, 1998.

Three days later at her home, Lise fell from her wheelchair and dislocated her replaced left hip, meaning "the head of the prosthesis came out of the socket." Appellant's App. p. 92. Dr. Bush performed a manipulative reduction of Lise's dislocated hip under general anesthesia.

Lise was then admitted to Hook Rehabilitation Center at Lafayette Home Hospital. On April 17, 1998, three days after the first dislocation, Lise's left hip dislocated again. Dr. John Gossard ("Dr. Gossard"), a physician at the rehabilitation center, consulted with the Garneaus and noted:

> I have discussed the situation with her and her husband. The dislocation needs to be reduced under a general anesthesia. At that time, examination can be done to determine its intrinsic stability, as well as AP and surgical lateral x-rays of the hip. I have told her and her husband that if the prosthesis is intrinsically unstable, that another operative procedure might be necessary. They are agreeable to the procedure as proposed.

Appellant's App. p. 946.

Dr. Gossard performed a second reduction on Lise's left hip on April 18, 1998. Lise was then transferred back to the rehabilitation center, and she remained in a brace for approximately six weeks. On May 11, 1998, Lise was transferred to a nursing home in Frankfort. An x-ray taken on June 11, 1998, revealed that the hip prosthesis was stable. Appellant's App. p. 388. The prosthetic hip did not dislocate again, but Lise continued to suffer from hip pain and was unable to bear weight on her left leg.

---

1. We heard oral argument on September 20, 2005, at the Indiana University School of Law–Indianapolis. We thank the faculty, staff, and students for their hospitality and counsel for their presentations.

Lise remained in the nursing home for more than eight months, until January 29, 1999. During that time, Dr. Bush continued to treat her hip pain. Specifically, Dr. Bush prescribed pain medications and ordered x-rays, evaluations, physical therapy, and ambulation for Lise.

After her discharge from the nursing home, Lise continued to treat with Dr. Bush for ongoing pain in her hip. Real Garneau ("Real") called Dr. Bush in July 1999 regarding Lise's continuing hip pain.[2] Dr. Bush prescribed more pain medication and ordered another x-ray. An x-ray taken on July 28, 1999, revealed some loosening of the prosthesis. Appellant's App. p. 99. Dr. Bush testified in his deposition that the loosening of the prosthesis could account for Lise's hip pain. *Id.* However, Dr. Bush continued to treat Lise's hip pain with medication. On September 14, 1999, Real called Dr. Bush again because of Lise's ongoing, sometimes severe, hip pain. As a result, Dr. Bush ordered another x-ray of Lise's hip.

On September 30, 1999, Dr. Bush referred Lise to an orthopedic surgeon, Dr. John Crane ("Dr.Crane"). Dr. Crane removed the Austin–Moore prosthesis and replaced it with a new bipolar prosthesis on November 8, 1999. After the second hip replacement, Lise experienced another dislocation requiring revision. Appellant's App. p. 929. She was then admitted to Healthsouth Rehabilitation Hospital in Kokomo on December 22, 1999. *Id.* at 968. While there, Lise underwent physical and occupational therapy, and made "slow, continuous progress throughout her rehabilitative stay." *Id.*

Specifically, the record reflects that on December 23, 1999, Lise's physician at the rehabilitation hospital, Dr. Robert Trout ("Dr.Trout"), noted that Lise "denied new complaints today, except for some left foot pain" and that her "pain [was] controlled well with present medications." *Id.* at 972. Dr. Trout's notes from December 27, 1999, indicate that Lise was able to "ambulate the length of the parallel bars three times earlier" that day and that she experienced "some limitations in therapies" due to discomfort from her brace and some left foot pain, but made no mention of hip pain. *Id.* at 971. On January 28, 2000, Lise had a follow-up appointment with Dr. Paul D. Ruesch ("Dr. Ruesch"), who recommended she discontinue use of her brace, but made no notes regarding any hip pain. *Id.* at 965. On March 8, 2000, Lise had another follow-up with Dr. Ruesch, who noted "she has no complaints of pain with respect to her hip at this point." *Id.* at 964.

On August 28, 2000, the Garneaus filed their Proposed Complaint for Damages against Dr. Bush with the Indiana Department of Insurance, alleging that Dr. Bush's treatment of Lise was negligent and breached the appropriate standard of care for orthopedic surgery.

On January 28, 2004, Dr. Bush filed a motion for summary judgment, contending that the Garneaus' complaint was barred by the two-year medical malpractice statute of limitations. In response, the Garneaus filed a Designation of Material Fact in Opposition to Defendant's Motion for Summary Judgment. The Garneaus' designated evidence included Dr. Bush's deposition, in which he testified that he had graduated from Indiana University School of Medicine in 1955. After completing the first year of a four-year surgical and orthopedic residence in Lexington, Kentucky, Dr. Bush left the residency program to set

---

**2.** Lise also experiences difficulty communicating due to her multiple sclerosis, so her husband called Dr. Bush on her behalf.

up a general practice in Frankfort, Indiana, where he has practiced since. Dr. Bush also testified in the deposition that the surgical and orthopedic techniques that he used in performing Lise's hip replacement were the same ones he had learned in the 1950s. Appellant's App. p. 90.

The Garneaus' designated evidence also included an affidavit from Dr. Robert Colyer ("Dr. Colyer"), a board-certified orthopedic surgeon and Associate Professor in the Department of Orthopedic Surgery at Indiana University Hospital. Dr. Colyer averred that Dr. Bush's use of an obsolete Austin–Moore prosthesis, as well as his failure to recommend revision of the prosthesis after Lise continued to suffer hip pain six months post-surgery, were breaches of the appropriate standard of care. Appellant's App. pp. 49–51.

The trial court heard oral argument on the summary judgment motion on December 21, 2004, and later granted summary judgment in favor of Dr. Bush. The Garneaus now appeal.

### Standard of Review

Summary judgment is a procedural means to halt litigation when there are no factual disputes and to allow the case to be determined as a matter of law. *Langman v. Milos*, 765 N.E.2d 227, 233 (Ind.Ct.App. 2002), *trans. denied* (citing *LeBrun v. Conner*, 702 N.E.2d 754, 756 (Ind.Ct.App. 1998)). Under Indiana Trial Rule 56, the moving party bears the burden of showing that there are no genuine issues of material fact. If the moving party meets its burden, the burden shifts to the non-moving party to set forth facts showing the existence of a genuine issue for trial. *Id.; Oelling v. Rao*, 593 N.E.2d 189, 190 (Ind. 1992).

Summary judgment is appropriate only if there is no evidence of a genuine issue of material fact for trial and the moving par-

ty is entitled to judgment as a matter of law. *Langman*, 765 N.E.2d at 233 (citing *Aide v. Chrysler Fin. Corp.*, 699 N.E.2d 1177, 1180 (Ind.Ct.App.1998), *trans. denied.*) However, summary judgment is inappropriate if any material facts are in dispute or even if undisputed facts could "lead to conflicting material inferences." *Id.* at 233–34 (quoting *Butler v. City of Indianapolis*, 668 N.E.2d 1227, 1228 (Ind. 1996)).

When the moving party asserts the statute of limitations as an affirmative defense and establishes that the action was commenced outside of the statutory period, the burden shifts to the non-moving party to establish an issue of fact material to a theory that avoids the affirmative defense. *Boggs v. Tri–State Radiology, Inc.*, 730 N.E.2d 692, 695 (Ind.2000).

### Discussion and Decision

The Garneaus contend that the trial court improperly granted summary judgment in favor of Dr. Bush on the basis that their complaint for medical malpractice was not timely filed. They allege that issues of material fact exist as to whether the statute of limitations was tolled by the doctrine of fraudulent concealment, as to whether the statute of limitations was tolled by the doctrine of continuing wrong, and as to alleged acts of negligence that occurred within two years of the filing of their complaint.

### I. Statute of Limitations

The statute of limitations for medical malpractice claims is contained in Indiana Code section 34–18–7–1(b):

> A claim, whether in contract or tort, may not be brought against a health care provider based upon professional services or health care that was provided or that should have been provided unless the claim is filed within two (2)

years after the date of the alleged act, omission, or neglect . . . .

Ind.Code § 34–18–7–1(b) (1999).

This occurrence-based statute of limitations has been upheld as constitutional on its face under the Indiana Constitution, Article I, Sections 12 and 23, but has also been held to be unconstitutional as applied in certain circumstances. *Langman v. Milos,* 765 N.E.2d 227, 234 (Ind.Ct.App. 2002), *trans. denied* (citing *Van Dusen v. Stotts,* 712 N.E.2d 491, 493 (Ind.1999); *Martin v. Richey,* 711 N.E.2d 1273, 1284–85 (Ind.1999)). The statute requires a medical malpractice claim be filed within two years of the negligent act and has been upheld as constitutional when applied to all plaintiffs able to discover the alleged malpractice and injury within two years from the occurrence. *See Martin,* 711 N.E.2d at 1278.

■ In *Rogers v. Mendel,* 758 N.E.2d 946 (Ind.Ct.App.2001), *trans. denied,* and *Shah v. Harris,* 758 N.E.2d 953 (Ind.Ct. App.2001), *trans. denied,* two panels of this court held that our supreme court's decisions in *Martin, Van Dusen,* and *Boggs* taken together create a two-stage analysis for the application of Indiana's two-year medical malpractice limitation period. The first stage of the analysis begins with determining whether a claimant discovered the alleged malpractice and resulting injury, or possessed information that would have led a reasonably diligent person to such discovery during the two-year period after the alleged act or omission. If the answer is affirmative, then the purely occurrence-based limitation period is both applicable and constitutional, so long as the claim can reasonably be asserted before the period expires. *Boggs,* 730 N.E.2d at 697–98; *Van Dusen,* 712 N.E.2d at 497–98; *Martin,* 711 N.E.2d at 1279–80; *Rogers,* 758 N.E.2d at 951; *Shah,* 758

N.E.2d at 958. *See also Langman,* 765 N.E.2d at 234–35.

■ However, if a claimant does not discover the alleged malpractice and resulting injury, and does not possess information that would lead a reasonably diligent person to such discovery during the two-year period, then the purely occurrence-based limitation period is unconstitutional as applied. *Van Dusen,* 712 N.E.2d at 497–98; *Martin,* 711 N.E.2d at 1279–80; *Rogers,* 758 N.E.2d at 951–52; *Shah,* 758 N.E.2d at 958–59. In such cases, a second stage of analysis must then be applied to determine when the claimant possessed enough information that, in the exercise of reasonable diligence, should have led to the discovery of the alleged malpractice and resulting injury. The date determined is the date the two-year limitations period begins to run for such a claimant. *Van Dusen,* 712 N.E.2d at 497–98; *Martin,* 711 N.E.2d at 1279–80; *Rogers,* 758 N.E.2d at 952; *Shah,* 758 N.E.2d at 959.

■ In determining the discovery date, we construe all facts in favor of the Garneaus as nonmovants. *See Levy v. Newell,* 822 N.E.2d 234, 238 (Ind.Ct.App. 2005), *trans. denied.* However, "the discovery date does not depend upon when a plaintiff knows with certainty that malpractice has occurred; a plaintiff need only know facts that through reasonable diligence would lead to the discovery of the alleged malpractice and resulting injury." *Jacobs v. Manhart,* 770 N.E.2d 344, 354 (Ind.Ct.App.2002), *trans. denied* (citing *Van Dusen,* 712 N.E.2d at 498–99).

The Garneaus contend that they could not have learned of any malpractice until Dr. Bush finally referred them to an orthopedic surgeon in September 1999. In turn, Dr. Bush argues that the Garneaus should have reasonably known of the alleged malpractice on April 17, 1998, when Dr. Gossard advised them that "if the

prosthesis is intrinsically unstable [ ] another operative procedure might be necessary." Appellant's App. p. 946. After Dr. Gossard performed the second reduction on Lise's hip on April 18, 1998, she did not experience any more dislocations. However, Dr. Gossard's notes upon Lise's discharge from Lafayette Home Hospital note that "[i]f further instability occurs, revision surgery might be necessary." Appellant's App. p. 1076. In addition, Dr. Gossard noted in an addendum dated May 29, 1998, "[i]f it ultimately proves to be unstable, a revision surgery might be necessary. She and her husband are agreeable to this." *Id.* at 1077.

Dr. Bush further argues, at the absolute latest, the Garneaus should have known when the Austin–Moore prosthesis was replaced on November 8, 1999, that they had a potential malpractice claim. We agree. By that date, Lise had experienced almost 20 months of pain and extreme difficulty abducting her hip, had spent some eight months in a nursing home, and had been advised by an orthopedic surgeon to have a new bipolar hip prosthesis installed. Thus, by November 8, 1999, at the very latest, the Garneaus possessed knowledge that should have led a reasonably diligent person to discover Dr. Bush's alleged malpractice.

■ Having concluded that the Garneaus reasonably should have known of the alleged malpractice, at the latest, by November 8, 1999, a date which falls within the occurrence-based limitations period, we must determine whether the Garneaus' claim could reasonably have been asserted before the period expired. *See Boggs,* 730 N.E.2d at 697. A plaintiff must have a "meaningful opportunity" to pursue their malpractice claim. *Jacobs,* 770 N.E.2d at 355 (quoting *Boggs,* 730 N.E.2d at 696). From November 8, 1999, approximately four months remained before the occur-

rence-based limitations period expired. Under the particular facts and circumstances presented here, four months in which to bring their malpractice claim did not make it a "practical impossibility" for the Garneaus to assert a timely claim. *Id.*

## II. Tolling of the Statute of Limitations

As set forth above, because Lise's original hip replacement surgery by Dr. Bush took place on March 17, 1998, the two-year occurrence-based limitations period for claims of negligence involving the surgery itself expired on March 16, 2000. The Garneaus did not file their medical malpractice complaint until August 28, 2000. In an effort to avoid the two-year statute of limitations, the Garneaus claim that the doctrine of fraudulent concealment and/or the doctrine of continuing wrong should apply and prevent their claim from being time-barred.

### A. *Fraudulent Concealment*

■ The Garneaus contend that their medical malpractice claim was timely filed because the doctrine of fraudulent concealment tolled the statute of limitations. The doctrine of fraudulent concealment is an equitable remedy that operates to bar a defendant from asserting the statute of limitations as a defense. Under this doctrine, a defendant who has prevented a plaintiff from discovering an otherwise valid claim, by violation of duty or deception, is estopped from raising a statute of limitations defense. *Halbe v. Weinberg,* 717 N.E.2d 876, 882 (Ind.1999) (citing *Hughes v. Glaese,* 659 N.E.2d 516, 519 (Ind.1995)).

■ There are two types of fraudulent concealment, active and passive. *Hopster v. Burgeson,* 750 N.E.2d 841, 857 (Ind. Ct.App.2001). Passive or constructive concealment may be merely negligent and arises when the physician does not disclose

to the patient certain material information. *Id.* " 'The physician's failure to disclose that which he knows, or in the exercise of reasonable care should have known, constitutes constructive fraud.' " *Id.* (quoting *Cyrus v. Nero,* 546 N.E.2d 328, 330 (Ind. Ct.App.1989)).

In the medical malpractice context, the doctrine of fraudulent concealment may operate to toll the statute of limitations until the termination of the physician-patient relationship, or until the patient discovered, or in the exercise of reasonable diligence should have discovered, the doctor's alleged malpractice. *Hughes,* 659 N.E.2d at 519. Thus, under the fraudulent concealment doctrine, the critical event for purposes of determining whether an action was timely filed is the plaintiff's discovery of facts that should have alerted them that they have a cause of action. *See Parks v. Madison County,* 783 N.E.2d 711, 719 (Ind.Ct.App.2002), *trans. denied* (citing *Boggs,* 730 N.E.2d at 692; *Fager v. Hundt,* 610 N.E.2d 246 (Ind. 1993)).

The Garneaus contend both that Dr. Bush should have known the Austin-Moore prosthesis was obsolete and that, after six months, he should have known that Lise's ongoing pain was caused by the prosthesis and would not resolve without surgery. However, to successfully invoke the doctrine of fraudulent concealment, the Garneaus must establish that Dr. Bush's concealment of material information somehow prevented them from inquiring into or investigating Lise's condition, thus preventing them from discovering a potential cause of action. *See Doe v. Shults–Lewis Child and Family Serv., Inc.,* 718 N.E.2d 738, 747 (Ind.1999). The uncontroverted evidence before the court reveals no such concealment.

Because Dr. Bush did not conceal material information from the Garneaus, we need not reach the question of whether the Garneaus filed their action within a reasonable time after discovery of "information which would lead to the discovery of malpractice if the patient exercises reasonable diligence." *LeBrun v. Conner,* 702 N.E.2d 754, 757 (Ind.Ct.App.1998) (quoting *Hughes,* 659 N.E.2d at 519). Under these facts and circumstances, the doctrine of fraudulent concealment does not save the Garneaus' claim.

### B. *Continuing Wrong*

Next, the Garneaus contend that issues of material fact exist with regard to whether the doctrine of continuing wrong tolled the commencement of the statute of limitations. The doctrine of continuing wrong applies where an entire course of conduct combines to produce an injury. *Boggs,* 730 N.E.2d at 699. When this doctrine attaches, the statutory limitations period begins to run at the end of the continuing wrongful act. *Havens v. Ritchey,* 582 N.E.2d 792, 795 (Ind.1991). In order to apply the doctrine, the plaintiff must demonstrate that the alleged injury-producing conduct was of a continuous nature. *Burton v. Elskens,* 730 N.E.2d 1281, 1284 (Ind.Ct.App.2000) (citing *Cyrus,* 546 N.E.2d at 331). "The doctrine of continuing wrong is not an equitable doctrine; rather, it defines when an act, omission, or neglect took place." *Hopster,* 750 N.E.2d at 858 (quoting *Coffer v. Arndt,* 732 N.E.2d 815, 821 (Ind.Ct.App.2000), *trans. denied* ).

The Garneaus contend that Lise's ongoing hip problems were the combined result of Dr. Bush's use of an obsolete prosthesis in her hip and his ongoing treatment of her hip pain with medication and physical therapy for the following eighteen months. They argue that the negligence of using an obsolete prosthesis "was compounded and continued by Dr. Bush's negligent failure to recognize and act on the fact that after

the six[-]month waiting period, her ongoing hip pain would not resolve without the prosthesis being removed." Br. of Appellant at 20.

In response, Dr. Bush contends that these types of alleged negligence are not the types of actions that constitute a continuing wrong. In support of this argument, he directs this court to several cases where we have applied the doctrine when a plaintiff's harm resulted from the failure to diagnose and treat a disease. *See, e.g., Follett v. Davis*, 636 N.E.2d 1282 (Ind.Ct. App.1994), *trans. denied* (failure to diagnose breast cancer); *Frady v. Hedgcock*, 497 N.E.2d 620 (Ind.Ct.App.1986), *trans. denied* (long term misdiagnosis and prescription of medications).

In *Frady*, Dr. Hedgcock had treated Beverly Frady for four years and had prescribed numerous medications for her during that period. 497 N.E.2d at 620–21. Specifically, between April 12, 1980 and June 17, 1980, Dr. Hedgcock wrote Beverly six prescriptions. *Id.* at 622. The record was not clear as to if or how many of those prescriptions were in effect on the date of Beverly's death, July 22, 1980. *Id.* Thus, we held that "a material issue of fact existed as to whether Dr. Hedgcock's treatment and prescriptions could be considered a continuing wrong as late as July 22, 1980, the last day for which the cause of action could have accrued." *Id.*

Here, the Garneaus argue that Dr. Bush's installation of an obsolete prosthesis, along with his continuing treatment of Lise's resultant hip pain with medication—instead of recommending revision of the prosthesis—produced her injury. In support of this argument, the Garneaus designated to the trial court the affidavit of Dr. Colyer. Based upon his professional background, education, and training, and upon his review of Lise's medical records, Dr. Colyer averred:

6. Dr. Charles E. Bush, Jr. fell below the applicable standard of care when he used an Austin[-]Moore prosthesis on Lise Garneau on March 17, 1998 to treat the subcapital fracture of her left hip. The Austin[-]Moore prosthesis was developed in the 1950's and is obsolete. On March 17, 1998, given the other available prostheses for this patient, it was a breach of the standard of care for Dr. Bush to use the Austin[-]Moore prosthesis on fifty-three year old Lise Garneau. The Austin[-]Moore prosthesis is a "press fit." The bone does not ingrow to this type of prosthesis and it does not have the ability to get permanently attached to bone. There is no benefit to using an Austin[-]Moore prosthesis as opposed to other more modern prostheses, for example there is no time saving benefit in the surgical procedure for this prosthesis and this prosthesis may not offer the same longevity before it needs to be replaced. As a result of Dr. Bush's negligence in using the Austin[-] Moore prosthesis for Lise Garneau, she suffered damage, including pain, loss of mobility and ambulation.

7. Dr. Bush indicated in his deposition that he did not know how to use any other type of prosthesis; he should have referred Lise Garneau to an orthopaedic surgeon for this surgery to give her options and the failure to do so was also [a] breach of the standard of care, resulting in additional surgeries, pain and limited ambulation for Lise Garneau.

8. The fact that the Austin[-]Moore prosthesis does not allow bone ingrowth, means that it is unstable and as a result can move and cause pain for the patient. Any physician who performs hip replacement surgery

knows or should know that this prosthesis can cause pain. If after six months following the hip replacement the patient continues to complain of pain, the only remedy is to remove and replace the Austin[-]Moore prosthesis. The failure to revise the prosthesis or refer the patient to an orthopaedic surgeon for revision when a patient has complaints of pain for six or more months is a breach of the standard of care.

\* \* \* \* \* \*

*Dr. Bush's failure to revise or recommend revision of the Austin–Moore prosthesis at any point six months or more after the surgery was a breach of the standard of care and resulted in her pain and inability to regain mobility and maximize her ability to ambulate.*

Appellant's App. pp. 49–51 (emphasis added).

Under these facts and circumstances, the Garneaus have established a genuine issue of material fact as to whether Dr. Bush's installation of an obsolete prosthesis, followed by treatment with prescription pain medication and failure to recommend revision after more than six months had passed since surgery, constituted a continuing wrong. *See Montgomery v. Crum*, 199 Ind. 660, 678–79, 161 N.E. 251, 259 (1928) ("Whether or not these acts formed an unbroken chain from the time they began until within the period of two years next before the bringing of this action, and were of such continuity as to constitute one wrong ... were facts for the jury ...").

■ While an issue of fact material as to the doctrine of continuing wrong remains, we must also note that a plaintiff may not sit idly by if they discover facts that alert them that they have a cause of action. *Parks v. Madison County*, 783

N.E.2d 711, 719 (Ind.Ct.App.2002). "[T]he doctrine of continuing wrong will not prevent the statute of limitations from beginning to run when the plaintiff learns of facts which should lead to the discovery of his cause of action even if his relationship with the tortfeasor continues beyond that point." *Id.* (citing *C & E Corp. v. Ramco Indus., Inc.*, 717 N.E.2d 642, 645 (Ind.Ct. App.1999)).

Here, the plaintiffs were aware of facts which should have led them to discover their cause of action, at the very latest, by November 8, 1999. Therefore, if the jury determines that Dr. Bush's actions constituted a continuing wrong, the statute of limitations would have begun to run on November 8, 1999, and expired on November 7, 2001. Thus, if applicable, the doctrine of continuing wrong saves the Garneaus' claim from summary judgment based on the statute of limitations.

### III. Continuing Treatment Beyond September 17, 1998, as a Separate Act of Negligence

■ Finally, the Garneaus likewise argue that, even if the doctrine of continuing wrong does not save their malpractice claim based upon the hip replacement surgery, their malpractice claim based upon Dr. Bush's negligence in his continuing treatment of Lise's pain after September 17, 1998, was timely filed. This date was the six-month anniversary of Lise's surgery and the date after which Dr. Colyer's affidavit asserts that continued treatment with pain medication and without revision or referral for revision was a breach of the applicable standard of care. We agree that Dr. Colyer's affidavit establishes a genuine issue of material fact in this regard, we therefore conclude that the trial court improperly granted summary judgment in favor of Dr. Bush concerning his treatment of Lise after September 17,

1998. Thus, even if the doctrine of continuing wrong does not apply to toll the statute of limitations, the Garneaus' claim for compensible injuries and damages based upon Dr. Bush's continuing treatment of Lise after September 17, 1998, is not time-barred.

## Conclusion

The Garneaus possessed information that would have led a reasonable person to discover the alleged malpractice of Dr. Bush's installation of an obsolete prosthesis within the applicable two-year statute of limitations. The doctrine of fraudulent concealment does not save the Garneaus' complaint from being time-barred. However, the designated evidence creates a genuine issue of material fact as to whether the doctrine of continuing wrong tolls the statute of limitations. In addition, the designated evidence creates a genuine issue of material fact as to whether Dr. Bush's treatment of Lise with pain medication and without revision or referral for corrective surgery after September 17, constituted a separate act of negligence. Therefore, the trial court erred in granting summary judgment in favor of Dr. Bush.

Reversed and remanded for proceedings consistent with this opinion.

BARNES, J., and CRONE, J., concur.